Commonwealth *v.* Sierakowski, Appellant.

322

Argued October 25, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ. (RENO, J., Absent).

*Charles B. Prichard,* for appellant.

*Jacob E. Kalson,* Assistant District Attorney, with him *Russell H. Adams,* District Attorney, for appellee.

OPINION BY KELLER, P. J., January 27, 1944:

Appellant, a physician of good repute[1] in McKees Rocks, Allegheny County, was charged, in an indictment containing two counts, with having unlawfully and feloniously administered to one Marie Young, a woman pregnant and quick with child, or supposed and believed so to be, a certain poison and drug with intent to procure her miscarriage (first count); and with having unlawfully and feloniously used a certain instrument and instruments upon the body of said Marie Young, a woman pregnant, etc., with intent to procure her miscarriage (second count); contrary to the provisions of section 718 of The Penal Code (P. L. 1939, 872, p. 958).

While section 718 bears the heading, 'Abortion', it does not mention the word in the body of the act. It is substantially a re-enactment of section 88 of the Criminal Code of 1860 (P. L. 382), which bore the heading, 'Procuring or attempting to procure abortion'. The heading is not, strictly speaking, a part of the section. It is not necessary to allege or prove an abortion in order to convict under the section mentioned. The gist of the offense in both codes is the unlawful use of

---

[1] The defendant called witnesses who testified to his good reputation as a law-abiding citizen. This opened the door to the Commonwealth to show that his reputation was not good—if such was the case: *Com. v. White,* 271 Pa. 584, 115 A. 870; *Com. v. Weber,* 167 Pa. 153, 163, 31 A. 481; *Hopkins v. Tate,* 255 Pa. 56, 61-62, 99 A. 210; *Com. v. Anthony,* 91 Pa. Superior Ct. 518, 521; but the Commonwealth did not attempt to rebut this evidence.

(1) drugs or (2) instruments with *intent to procure* a miscarriage or abortion—for they mean the same thing.

While the words 'abortion' and 'miscarriage' are synonymous according to the dictionary, common usage has given to the former, when used with respect to human beings, the meaning of a criminal miscarriage as over against a natural miscarriage.

We refer to it at this length because the assistant district attorney who prosecuted the case, the attorney who *then* represented the defendant, and the trial judge, all three, apparently thought that the indictment charged the defendant with having committed a criminal abortion, and as no miscarriage had actually occurred, that he could be convicted only of an attempt to commit an abortion. There was not sufficient evidence to justify a verdict of guilty as to the first count—the use of drugs; but if the evidence was sufficient to convict on the second count—the use of instruments—the verdict should have been "guilty in manner and form as indicted in the second count". There is no *statute* [2] in Pennsylvania—and never has been—that punishes a defendant for a criminal abortion, other than the sections of The Penal Code of 1860 and 1939 above referred to, which relate to the unlawful administering of drugs to a woman, with intent to procure her miscarriage, or the unlawful use of instruments upon her, with like intent (sec. 718 of the Code of 1939; sec. 88 of the Code of 1860) ; and the like unlawful administering of drugs to any woman, pregnant or quick with child, or supposed and believed so to be, or the unlawful use of

---

[2] The production of an abortion or miscarriage was an offense at common law: *Com. v. Demain,* Brightly's Reports, 441; so was an attempt to procure an abortion: *Mills v. Com.,* 13 Pa. 630, 632. See also Statutes of 43 Geo. III, c. 58, and 9 Geo. IV, c. 51, sec. 14, which distinguish between cases where the woman was *quick* and was *not quick* with child, although pregnant.

any instrument or other means upon said woman, with the intent to procure her miscarriage, resulting in the death of the woman, or of any child of which she may be quick (sec. 719 of the Code of 1939; sec. 87 of the Code of 1860); and neither of them requires an actual abortion or miscarriage for a conviction. The jury— following the instructions of the court as to the form of the verdict if they found defendant guilty—rendered a verdict of guilty of attempted abortion. However, no harm was done the defendant by the verdict as rendered, for a verdict of guilty in manner and form as indicted under section 718 supra, in effect, amounts to the same thing: *Com. v. Trombetta,* 131 Pa. Superior Ct. 487, 490-491, 200 A. 107; *Mills v. Com.,* 13 Pa. 630, 632. The Penal Code contains no section charging a completed criminal abortion or requiring such abortion in order to convict.

The evidence produced by the Commonwealth—apart from the testimony of Mrs. Young, who was called as a Commonwealth's witness—was not very strong, yet we think it was sufficient to take the second count to the jury. But the Commonwealth was not satisfied to rest its case without calling Mrs. Young, and in the course of her examination and the court's references to it, reversible harm was done the defendant.

The assistant district attorney had been told by Mrs. Young, on being examined prior to the trial, that she had not consulted the defendant for the purpose of procuring a miscarriage and that he had not used any instrument upon her for that purpose. Her story was that since her last baby she had been irregular and after her menstrual period she had such severe cramps that she was "awful sick", and that she had consulted the defendant about the middle of August to see what was wrong and what could be done about it. He advised treatment, but as she and her husband had arranged to go away on their vacation at that time, she

didn't want to interfere with those plans; but while on their vacation she got an "awful discharge" and there was a "terrible burning", so on September 11 she went to see him and was having her fourth treatment on September 16, when Sergeant Riddle and Detective Weber had "barged" into the defendant's private office where she was undergoing a treatment. She said that defendant had told her that she had a tear, and some infection which probably caused her menstrual irregularity and pain. She testified that she did not know that she was pregnant, but that the defendant, in the course of a treatment, had said that if she was pregnant the treatment for the infection would help to prevent a miscarriage; that she had not gone to the defendant to procure an abortion and that she had never told any one that she had gone to him for that purpose. She further testified that Dr. Schneider, a witness for the Commonwealth, who had made a ten-minute examination of her at the Mercy Hospital very shortly after the detectives found her on defendant's table, had told her that she was pregnant and would abort that afternoon or the next morning; but that she had not aborted up to the time of the trial, three months later.

It is not clear whether the assistant district attorney misunderstood her or insisted on putting a wrong construction on her testimony; but, asserting that in his examination of the witness she had never told him that she had gone to the defendant to be treated in order to avoid a miscarriage, he pleaded surprise and cross-examined her with considerable rigor on that score, the effect of which, unquestionably, was to throw discredit on her testimony. She had not testified, either in direct or cross examination, that she had gone to defendant to be treated for the infection, in order to prevent a miscarriage. She had consistently said that she did not know whether she was pregnant or not; that she had consulted defendant because of her severe cramps and

pains, and had gone to him to be treated for the infection, which he said she had, and which was causing her menstrual irregularity and great pain. The only reference she had made to the subject of miscarriage was that defendant had said to her, in the course of a treatment, that if she was pregnant, his treatments would tend to prevent a miscarriage. But the prosecuting attorney insisted on examining her, as if she had said she had gone to defendant to be treated *in order to prevent a miscarriage,* which she had never even suggested. His cross-examination on this point was not warranted by anything she had said, it put into her mouth words she had not spoken, and could not fail to discredit her testimony with the jury. And the injurious effect on defendant's case was increased when the trial judge in discussing the matter with counsel said: "The Commonwealth naturally wouldn't expect the woman to admit that she had gone for the purpose of being aborted"; and in his charge to the jury said that Mrs. Young was an interested witness, and "I said at the time that the District Attorney could hardly expect to have the woman admit that she had gone to the office of the defendant for the purpose of being aborted. However, I did not mean to infer from that that she had gone there for that purpose, *but assuming that she had,* the District Attorney could scarcely be expected to rely on her being willing to testify to that." (Italics supplied).

It is well settled in this Commonwealth that a woman who submits herself to a doctor to have an abortion procured, is not an *accomplice,* or *particeps criminis,* within the rules governing the testimony of such persons: *Com. v. Weaver,* 61 Pa. Superior Ct. 571, 580; *Com. v. Bell,* 4 Pa. Superior Ct. 187, 192, 193; Henry's Pennsylvania Trial Evidence, sec. 466. She is regarded rather as a victim: *Com. v. Bricker,* 74 Pa. Superior Ct. 234-239.

The rule is probably a matter of necessity, or public policy, for otherwise the admission of a dying declaration under the Act of June 26, 1895, P. L. 387, would do little good, if the court were obliged to warn the jury that it should be received with great caution as the testimony of an accomplice: *Com. v. Bricker*, supra; see also *Com. v. Kline*, 66 Pa. Superior Ct. 285, 288; *Com. v. Heffelfinger*, 82 Pa. Superior Ct. 351, 353; *Com. v. Thomas*, 94 Pa. Superior Ct. 353, 355.

By testifying that she had done so, the woman would not expose herself to prosecution; and women do frequently so testify on the trial of the person performing the operation.

Mrs. Young was a very important and material witness for the defendant; and she was entitled to have her testimony given due consideration by the jury, without being prejudiced by an unfair and unwarranted cross-examination by the attorney who had called her as a witness, and thus vouched for her credibility, or by the damaging and unnecessary remark of the trial judge, repeated and emphasized to the jury. See *Com. v. Weaver*, supra; *Com. v. Meads*, 29 Pa. Superior Ct. 321, 329-330.

The second and fourth assignments of error are sustained.

Between the time of the trial and the pronouncing of sentence, Mrs. Young gave birth to a full-time child which was still-born. The doctor who attended her made affidavit that in his opinion this result was due to a pathological condition of the cervix and ovaries; that "Mrs Young gave me a history, including three previously still-born children, which, in my opinion, were due to the same pathological condition."

This was opposed to Dr. Schneider's testimony that in his ten-minute examination of Mrs. Young he found no infection or pathological condition requiring treatment.

In view of the errors committed on the trial, we think the court might well have granted defendant's motion for a new trial on the ground of after-discovered evidence, which was impossible to be obtained until the birth of the child, and was of a character, likely to produce a different verdict on a retrial, free of the errors above pointed out (assignment 5).

The judgment is reversed, with a new venire.