418 A.2d 365

COMMONWEALTH of Pennsylvania

v.

William Michael STRUBE, Appellant.

Superior Court of Pennsylvania.

Argued March 19, 1979.

Filed Dec. 28, 1979.

Samuel M. Mecum, Lancaster, for appellant.

Edward F. Browne, Jr., Assistant District Attorney, Lancaster, submitted a brief on behalf of the Commonwealth, appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

PRICE, Judge:

In this appeal we are asked to determine the constitutionality of a portion of the Pennsylvania rape shield law (18 Pa.C.S. § 3104(b)). Because we find that section of the Crimes Code passes constitutional muster in the face of the arguments advanced, and because we determine appellant's other allegations of error to be without merit, the order and judgment of sentence are affirmed.[1]

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the following is a summary of the pertinent facts adduced at trial. After leaving work at 11:00 p. m. on May 7, 1976, Miss Pamela Kay Fisher accompanied her boyfriend to a party hosted by a mutual acquaintance. The occasion failed to produce a convivial

---

1. Appellant was convicted of rape (18 Pa.C.S. § 3121(1)) and simple assault (18 Pa.C.S. § 2701(a)(1)), following a jury trial concluded on March 23, 1977. Subsequent to the denial of post-trial motions, he was sentenced to concurrent terms of from 14 months to 5 years imprisonment on the rape conviction, and from 6 to 23 months on the simple assault conviction. He was also ordered to pay a fine of $500 and costs of prosecution for the rape offense, and a fine of $100 for the simple assault offense.

atmosphere between the two, and an argument ensued which later prompted Miss Fisher to leave her companion's truck during the ride home following the party. She was quickly picked up by another male friend, and while the two were stopped at a gas station, they encountered three friends, including appellant, who invited them to another party. In fact, the three took Miss Fisher, unaccompanied, to a building used by the Sons of Satan Motorcycle Club.

After entering the building and being given a beer, Miss Fisher was embraced by one of the three men. When she resisted, appellant joined the fracas and forced the victim onto a sofa. Miss Fisher swung her hand out and struck appellant, who promptly responded by bloodying Miss Fisher's nose and striking her twice more. He then ordered her to rise, and upon her refusal, dragged the victim to another sofa and demanded that she undress. Stalling for time, Miss Fisher persuaded appellant to undress first, while she surreptitiously attempted to unlock the front door. The endeavor was unsuccessful, and appellant tore off her clothing, forced her upon the sofa, and proceeded to have intercourse with the victim. During this time, appellant continued to pummel Miss Fisher about the head because of the latter's struggle to free herself. She finally feigned unconsciousness and a later "revival", and was then allowed to gather her clothing, dress, and leave the clubhouse still in the company of her three abductors. When the group stopped for dinner, Miss Fisher escaped, and after a short rest at home, reported the incident to the police.

Appellant's first contention is based on the following facts. Prior to trial, appellant filed a motion and offer of proof indicating his intention to introduce evidence establishing the victim's prior sexual conduct with appellant, as well as her consent to the sexual intercourse on the night in question. This motion was submitted pursuant to 18 Pa.C.S. § 3104(b) which provides:

"(a) General rule.–Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation

evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

(b) Evidentiary proceedings.–A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a)."

Appellant accompanied the above motion with a challenge to the constitutionality of the statute, alleging that its effect was to deny him his fifth amendment rights, his right to due process, and his right to confront his accusors. Following an in camera hearing convened in accordance with 18 Pa.C.S. § 3104(b), and attended by the district attorney, the Honorable John A. Walter ruled the statute constitutional and held that appellant could testify at trial, if he so chose, as to his prior sexual relations with the victim. The hearing judge also ruled that the assistant district attorney would not be forbidden from discussing the in camera proceedings with the victim or any other Commonwealth witness.

Appellant now raises two challenges to the constitutionality of 18 Pa.C.S. § 3104(b).[2] Initially, he cites the decisions by the United States Supreme Court in *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), and

---

2. Appellant's brief to this court contains a tripartite attack on the statute's validity. One argument, however, dealing with the statute's alleged infringement of his sixth amendment right to a trial by jury, was not presented to the trial court in appellant's written post-trial motions, nor was it discussed in the court's opinion on those motions. It has consequently not been preserved for appellate review. *Commonwealth v. Carr*, 471 Pa. 86, 369 A.2d 1207 (1977); *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975).

that of our own supreme court in *Commonwealth v. Conta-kos*, 455 Pa. 136, 314 A.2d 259 (1974), as support for his contention that the disclosure requirement of 18 Pa.C.S. § 3104(b) violates his due process rights guaranteed by the fourteenth amendment. We disagree.

■ The *raison d'etre* of 18 Pa.C.S. § 3104, and similar rape shield laws in other jurisdictions, is to partially correct the manner in which our criminal justice system has approached the victim of a sexual assault. That system, and society in general, has been severely criticized as being overly solicitous in protecting the interests of the alleged male perpetrator, to the virtual exclusion of the female's sensibilities and legal rights.[3] In apparent response to this condemnation, several jurisdictions have enacted legislation designed to alleviate the physical trauma and emotional disorientation suffered by the sexually assaulted female. *E. g.*, 1974 Conn.Pub.Acts. 74–131; 1974 Iowa Acts ch. 1271, § 2 (repealing the requirement that testimony of complainant be corroborated); Act of July 30, 1975, P.L. 131, No. 65, § 1, 35 P.S. § 10171 (requiring health education institutions to give instruction in treating rape victims to provide for their physical and emotional well being); Minn.Stat.Ann. §§ 241.-51 to 53 (Supp.1979) (directing development of community-

---

3. *See, e. g.*, S. Brownmiller, Against Our Will: Men, Women and Rape (1975); Berger,.Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom, 77 Colum.L.Rev. 1 (1977) [hereinafter cited as Berger]; Meyer, Rape: The Victim's Point of View, 3 Police L.Q. 38 (1974); Comment, Rape and Rape Laws: Sexism in Society and Law, 61 Calif.L.Rev. 919 (1973); Note, the Victim in a Forcible Rape Case: A Feminist View, 11 Am.Crim.L.Rev. 335 (1973).

This disapprobation with which rape victims are viewed is not amenable to rational justification, but is instead apparently predicated on historical, emotional, and pseudo-psychological factors. In a traditionally male dominated society, there has been a tangible expression of 'fear and loathing' directed toward the female who would cry rape; such fear being rooted in concepts as ancient as the biblical notion of female vengeance (exemplified in the parable of Potiphar's wife, *see* Genesis 39 and Brownmiller, *supra* at 21–23) and as recent as Freud's psychological proposition that women frequently and graphically fantasize about rape, *see* III Wigmore, Evidence § 924(a) (3d ed. 1940).

based programs to aid victims of sexual assault); *see generally* Rudstein, Rape Shield Laws: Some Constitutional Problems, 18 William and Mary L.Rev. 1, 2–3 (1976) [hereinafter cited as Rudstein]. The most prevalent type of reform, however, deals with statutes altering the traditional rules of evidence in rape cases so as to limit in some degree the defendant's inquiry into the previous sexual life of the alleged victim.[4]

At common law, rape had traditionally been defined as sexual intercourse between a male and a female, not his wife, by force and against her will. *See, e. g.,* 18 Pa.C.S. § 3121; Perkins, Criminal Law 152 (2 ed. 1969). Such a definition made lack of consent a material element of the offense, and its presence a recognized defense. To assist the defendant in establishing such consent, it has almost universally been held that one accused of forcible rape may attempt to prove the complainant's bad character for chastity.[5] *See* I Wigmore, Evidence §§ 66, 200 (3d ed. 1940). This constitutes an exception to the general rule in criminal law that evidence of bad character, whether reputation, opinion from observation, or specific acts, will not be received to prove that the person whose character is sought to be shown engaged in certain conduct on a particular occasion. *Commonwealth v. Connolly,* 217 Pa.Super. 201, 269 A.2d 390 (1970); 1 Wigmore, Evidence § 57 (3d ed. 1940); McCormick,

4. At least 32 jurisdictions have adopted some type of rape shield law. For a list of these statutes as of January 1977, *see* Berger, *supra* at 32, n. 196.

5. This is not the sole judicial assistance offered the rape defendant; the requirement of corroboration and strict proof of forcible resistance have been long established and recently condemned by contemporary reformers. The rationale for such formidable barriers to conviction was voiced by Lord Hale thusly:

"A charge [of rape] such as that made against the defendant in this case is one which is easily made and, once made, difficult to defend against, even if the person accused is innocent.

Therefore, the law requires that you examine the testimony of the female person named in the information with caution."

1 M. Hale, History of the Pleas of the Crown, 635 (1st Am. ed. 1847).

Evidence § 91 (2d ed. 1972).[6] Although this information might possess some degree of relevancy, "a doctrine of Auxilliary Policy . . . operates to exclude what is relevant,—the policy of avoiding the uncontrollable and undue prejudice, and possible unjust condemnation, which such evidence might induce . . . ." I Wigmore, Evidence § 57 (3d ed. 1940).

In the case of rape, however, the admission of such testimony is merely one facet of the offense which makes it *sui generis.*[7] It is premised on the *a priori* conclusion of the courts that it is more probable that an unchaste woman would assent to intercourse than a virtuous woman.[8] *See* Rudstein, *supra* at 4. The classic, if rather extravagant, formulation of this argument was advanced by Cowen, J., in *People v. Abbot*, 19 Wend. 192, 195–96 (N.Y.1838):

> "The prosecutrix is usually, as here, the sole witness to the principal facts, and the accused is put to rely for his defense on circumstantial evidence. Any fact tending to the inference that there was not the utmost reluctance and the utmost resistance is always received . . . . The connection must be absolutely against the will; and are we to be told that previous prostitution shall not make one among those circumstances which raise a doubt of assent? That triers should be advised to make no distinction in their minds between the virgin and a tenant of the stew,—between one who would prefer death to pollution, and another who, incited by lust and lucre, daily offers her person to the indiscriminate embraces of the other sex? And will you not more readily infer assent in the practiced

6. This general tenet admits of several exceptions, two of which being that such evidence is admissible when the defendant initially offers evidence of his good character, *Commonwealth v. Sierakowski*, 154 Pa.Super. 321, 35 A.2d 790 (1944), and in homicide cases when the accused raises an issue of self-defense. *Commonwealth v. Amos*, 445 Pa. 297, 284 A.2d 748 (1971).

7. *See* Berger, *supra* at 7–10.

8. A very few courts have also taken the position that unchastity reflects on credibility as a whole, *i. e.*, unchastity imports dishonesty. *See Frank v. State*, 150 Neb. 745, 35 N.W.2d 816 (1949).

Messalina in loose attire than in the reserved and virtuous Lucretia? . . . [T]here is not so much probability that a common prostitute or the prisoner's concubine would withhold her assent as one less depraved; and may I not ask, does not the same probable distinction arise between one who has already submitted herself to the lewd embraces of another, and the coy and modest female severely chaste and instinctively shuddering at the thought of impurity? "

A later writer, more restrained but no less dogmatic, opined that "no impartial mind can resist the conclusion that a female who had been in the recent habit of illicit intercourse with others will not be so likely to resist as one who is spotless and pure." *Lee v. State*, 132 Tenn. 655, 658, 179 S.W. 145, 145 (1915).[9]

Instantly, neither the traditional rules of evidence regarding the admission of such testimony, nor the question of whether there does indeed exist a causal connection between prior sexual activity and subsequent voluntary consent in light of contemporary sexual mores need detain us. The arguments are persuasive that the logical underpinnings of the character doctrine are dubious in the extreme. *See, e. g.,* Brownmiller, *supra* ; Berger, *supra* ; Comment, Rape Evidence Reform in Missouri: A Remedy for the Adverse Impact of Evidentiary Rules on Rape Victims, 22 St. Louis U.L.J. 367 (1978); Note, 9 Ind.L.Rev. 418, 429–30 (1976); Note, 7 Loyola L.J. 118, 125 (1976). More importantly for the purpose of our decision, 18 Pa.C.S. § 3104(a) represents legislative determination that such evidence is inadmissible, save in severely limited situations.

What is certain is that the introduction of such evidence at trial has a highly traumatic and embarrassing effect on the complaining witness. Indeed, in our present adversarial system, the art of cross-examination in rape cases is often employed not as a rapier to reveal the nuances of a witness's testimony, but as a bludgeon to underscore the complain-

9. For further judicial rhetoric along these lines, *see* Note, 3 Hofstra L.Rev. 403, 403 n.3 (1975).

ant's possibly checkered past.[10] Of course, as one commentator has noted, "it hardly seems appropriate to place embarrassment to the witness in the same class with the injury inflicted on the defendant if he is wrongly convicted at trial." Berger, *supra* at 41. Courts have, however, recognized a need to protect a person who takes the stand from attacks designed merely to harass or humiliate him. *See Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931).

The rape shield laws are legislative recognitions of the minimal probative value of sexual history and are designed to prohibit, to varying degrees, the travesty of presenting a noisome stream of defense witnesses testifying to the sexual propensities, often sordid and sometimes fanciful, of the complaining witness. The particular details of the various statutes are not germane to the instant discussion[11] although broadly they might be described by their relative position on a spectrum of admissibility ranging from highly restrictive to highly permissive.[12] The former is exemplified by Michigan, which admits only conduct with the defendant and specific instances of sexual activity if the proof is material to a fact at issue and its "inflammatory or prejudicial nature does not outweigh its probative value." Mich. Comp.Laws Ann. § 750.520j. At the opposite extreme are those statutes acting as little more than a reminder to the trial judge to take particular note of the character evidence

10. Such tactics, coupled with the system's perceived hostility to the rape complaint, may well account for the gross underreporting of the crime. It has been estimated that the actual incidence of rape ranges from three and one-half to twenty times the reported figure. Note, 81 Yale L.J. 1365, 1374–75 (1972).

11. For an overview of the rape shield laws, *see* Berger, *supra* at 32–39; Rudstein, *supra* at 9–14. A closer examination of individual statutes may be found in the myriad law review articles on the subject. *See, e. g.,* Comment, Idaho Code § 18–6105: A Limitation on the Use of Evidence Relating to the Prior Sexual Conduct of the Prosecutrix in Idaho Rape Trials, 15 Idaho L.Rev. 323 (1979); Comment, The Kentucky Rape Shield Law: One Step Too Far, 66 Ky.L.J. 426 (1977); Note, 52 Wash.L.Rev. 1011 (1977).

12. *See* Berger, *supra* at 33.

presented. New York, for example, states a general rule of exclusion then emasculates its efficacy with several specific exceptions and appends a final provision permitting the admission of evidence "determined by the court . . . to be relevant and admissible in the interests of justice." N.Y.Crim.Proc.Law § 60.42(5). The majority of statutes fall between these two extremes.

Of more immediate import are those statutes, at least fifteen, which provide for a type of preliminary hearing similar to that contained in 18 Pa.C.S. § 3104(b).[13] While most do not discuss the form of the hearing, a majority expressly demand that the proceedings regarding admissibility be held in camera, e. g., N.D.Cent.Code § 12. 1–20–15(3) (1975). Concerning the timing of the hearing, the statutes vary widely as to whether it should be held prior to or during trial.

It is this hearing and the concomitant disclosure of defense information that appellant deems repugnant to the principle of *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), which examined the Oregon notice of alibi rule. That statute provided that if a defendant proposed to rely on an alibi defense during trial, he was obliged to serve upon the district attorney a written notice of the purpose and details of such evidence within five days of trial. The obvious intent of the rule was to protect the state against an eleventh-hour defense composed of a fabricated alibi, the five day "lead-in" time furnishing the prosecution with a sufficient opportunity to investigate the exculpatory information. The defendant in *Wardius* failed to submit the requisite notice and, in accordance with the statute, was prohibited from introducing his alibi evidence at trial and was subsequently convicted. In reversing the conviction and remanding for a new trial, the Supreme Court, speaking through Justice Marshall, held that while the object of the rule was legitimate, its failure to provide for reciprocal

---

**13.** Some statutes provide for no preliminary hearing. *E. g.*, Mont. Rev.Codes Ann. § 45–5–503(5); Ohio Rev.Code Ann. § 2907.02(D)–(F).

discovery rendered it repugnant to the due process clause of the fourteenth amendment:

"Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . . it does speak to the balance of forces between the accused and his accuser. . . . [I]n the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State."

*Wardius v. Oregon, supra* at 474–75, 93 S.Ct. at 2212–13. (footnote omitted).

Our supreme court subsequently relied on *Wardius* in *Commonwealth v. Contakos*, 455 Pa. 136, 314 A.2d 259 (1974), when it struck down as unconstitutional Pennsylvania's version of the notice-of-alibi rule (former Pa.R.Crim.P. 312). Although the court noted some basic differences in the two rules, as well as the fact that Pennsylvania conferred upon the defendant some minimal discovery rights, it held the distinction insufficient to yield a result departing from that reached by the Supreme Court in *Wardius.*

Appellant attempts here, however, to bridge far too wide a chasm in analogizing the notice-of-alibi rule in *Wardius* and *Contakos* with the rape shield law, and several problems become apparent when importing the alien concept of reciprocity into these laws. First, the type of evidence which the defendant is forced to reveal in *Wardius* type situations is fundamentally different from the disclosure envisioned by the rape shield law. In the former, revelation of an alibi defense is tantamount to the disclosure of the entire defense based on mistaken identity. This was the pivotal point of *Wardius*—the fact that the prosecution received a comprehensive description of the defendant's case without the

necessity to disclose even the slightest portion of its own accumulated information. Disclosure of unchastity evidence, however, is at least one step removed from the elements forming a charge of rape. That is, even if the evidence of prior sexual conduct is rebutted or disbelieved, the defendant has nevertheless not been precluded from being awarded an acquittal predicated on a defense of consent. Such disclosure is not in the nature of a bald and unreciprocated disclosure of trial information, but is more akin to a pre-trial motion to rule on any number of evidentiary matters. Such a conclusion was reached by the Washington Court of Appeals in *State v. Blum*, 17 Wash.App. 37, 561 P.2d 226 (1977). In *Blum*, the court, replying to a due process attack made on the Washington Rape Shield Law,[14] noted the difficulty in delaying certain evidentiary rulings until the trial proper, and the salutary role of the motion in limine:

> "In making that determination and in ruling on the motion to admit or exclude evidence, the considerations are the same as those involved in ruling on the usual motion in limine." *Id.* at 44, 561 P.2d at 230.[15]

14. R.C.W.A. 9.79.150 provides for the general exclusion of the victim's past sexual conduct unless: the defendant makes a pre-trial motion to the court and prosecutor accompanied by affidavits stating the offer of proof; the court holds a hearing outside the presence of the jury; the court concludes that the evidence is relevant to the victim's consent, its probative value is not outweighed by substantial prejudice, and its exclusion would result in the denial of substantial justice to the defendant.

15. We note that in *People v. Blackburn*, 56 Cal.App.3d 685, 128 Cal.Rptr. 864 (1975), the California Court of Appeals upheld the California Rape Shield law against constitutional attack, albeit not based on the *Wardius* requirement of reciprocity:

> "Evidence Code section 782, adopted in 1974 as a companion to the amendment to section 1103, imposes a procedural limitation upon the admissibility of evidence of sexual conduct of the alleged victim of rape or a related offense offered to attack her credibility. Section 782 requires that the testimony be preceded by a written motion by the defendant accompanied by an affidavit containing an offer of proof. If the trial court finds that the offer of proof is 'sufficient,' it must conduct a hearing out of the presence of the jury and allow the alleged victim to be questioned 'regarding the offer of proof . . . .' 'At the conclusion of the hearing, if the

The evidence released is thus merely a quantum of the defendant's case, not the whole of his defense.

Second, 18 Pa.C.S. § 3104(b) does not provide the Commonwealth any "lead-time" to act on information it might gain as a result of the hearing. The requirement of disclosure at a specified time prior to trial was an integral part of the notice-of-alibi laws, for their purpose was to allow the state a sufficient amount of time to investigate the new information. Removing this feature from the rape shield law ensures that while the discovery procedure is, to a limited degree, a one-way street, the fact that it is necessarily a *cul-de-sac* obviates the danger of prejudice to the defendant.[16]

> court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant . . . and is not inadmissible pursuant to Section 352 of [the Evidence Code], the court may make an order stating what evidence may be introduced by the defendant, and the nature of questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.'
>
> Defendant contends: . . . by requiring him to make an offer of proof before he presents his testimony, the section denies him his privilege against self-incrimination.
>
> .  .  .  .  .
>
> [But the California Supreme Court has stated]: 'A reasonable demand for factual information which, as in *Jones,* [*Jones v. Superior Court,* 58 Cal.2d 56, 22 Cal.Rptr. 879, 372 P.2d 919] pertains to a particular defense or defenses, and seeks only that information which defendant intends to introduce at trial, may present no substantial hazards of self-incrimination and therefore justify the trial judge in determining that under the facts and circumstances in the case before him it clearly appears that disclosure cannot possibly tend to incriminate defendant.' ([*Prudhomme v. Superior Court*] 2 Cal.3d 320 at p. 327, 85 Cal.Rptr. 129 at p. 134, 466 P.2d 673 at p. 678.)" *Id.* at 691–92, 128 Cal.Rptr. at 867–68.
>
> In *Blackburn,* however, the offer and hearing were made immediately prior to the defense presentation and subsequent to the state's exposition of its case.

16. While any danger of this might be further reduced by prescribing that the hearing be held immediately prior to introduction of the evidence, we do not deem such a step absolutely necessary. While a prosecutor might conceivably attempt to circumvent the intent of the rule by requesting a continuance immediately proceeding the pre-trial hearing, any such contrived maneuver should be summarily refused by the trial judge.

Finally, assuming *arguendo* that the state should be required to make some disclosure in the face of the defendant's offer, of what type evidence should this reciprocal information be composed? The symmetrical argument employed in *Wardius* would apparently require that the prosecution reveal the essence of the evidence it plans to employ in rebuttal,[17] but that evidence, focused on the narrow point of prior sexual history, is likely to be meager. Yet, if the state were forced to divulge material pertaining to the broader issue of consent or mistake, then it would be displaying its entire case while receiving precious little in return. Of course, as the Court in *Wardius* noted: "[t]he State's inherent information-gathering advantages suggest that if there is to be any imbalance in discovery rights, it should work in the defendant's favor." *Wardius v. Oregon, supra* 412 U.S. at 475 n.9, 93 S.Ct. at 2212 n.9. But allowing the defendant to force prosecutorial revelation upon the mere offer of proof would result in the distinct possibility of defense manipulation. While in general more liberal defense discovery is a worthwhile object, *see* Pa.R.Crim.P. 305, we cannot countenance such a potentially drastic alteration in the normal discovery procedure. Consequently, any analogy to *Wardius* and *Contakos* is inappropriate.

Appellant's second argument directed against the statute relates to its alleged violation of his fifth amendment privilege against self-incrimination. In our resolution of this question, we are guided by the decision of the United States Supreme Court in *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). The challenge raised in *Williams* to the Florida notice-of-alibi rule was premised on the contention that the provision for a pre-trial hearing resulted in the disclosure of information furthering the defendant's conviction, thus compelling him to be a witness against himself in violation of his fifth amendment rights. In response, the Court observed,

17. *Wardius* required that the state disclose evidence which goes to the "refutation of the very pieces of evidence which [the defendant] disclosed to the State." *Wardius v. Oregon,* 412 U.S. 470, 476, 93 S.Ct. 2208, 2213, 37 L.Ed.2d 82.

"In the case before us, the notice-of-alibi rule by itself in no way affected petitioner's crucial decision to call alibi witnesses or added to the legitimate pressures leading to that course of action. *At most, the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that the petitioner from the beginning planned to divulge at trial.* Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself." *Williams v. Florida, supra* at 85, 90 S.Ct. at 1898. (emphasis added).[18]

An identical situation prevails instantly: Appellant is merely required to accelerate his presentment in a manner not inconsistent with fifth amendment mandates; he is not compelled in the constitutional sense to reveal potentially damaging informations. As the court in *Williams* noted, the fact that a defendant faces the dilemma of whether to maintain complete silence or present a defense has never been held to be an invasion of the privilege against self-incrimination. *Id.* at 84, 90 S.Ct. at 1897. *See also, People v. Blackburn,* 56 Cal.App.3d 685, 128 Cal.Rptr. 864 (1975) (California rape shield law held constitutional in face of similar attack). He remains unfettered in his decision on whether or not to take the stand; his actions are circumscribed by the rape shield law only after that decision has been made.

■ Appellant's second argument is based on a portion of the trial judge's charge. After deliberating some seven hours, the jury returned to the courtroom with the question: "If mitigating circumstances apply to this case, and if so how may the jury consider mitigating circumstances." (N.T. 278). The trial judge responded to the query as follows:

18. In dissent, Justices Black and Douglas argued that pre-trial pressures on the defendant differ in both form and degree from those operative at trial. That is, prior to trial the defendant is forced to disclose his defense or risk preclusion at a time when he is still ignorant of the strength of the case against him.

"THE COURT: Well, it's not like military justice where there are mitigating and extenuating circumstances which are found and considered by a Court. At least that's the way it used to be when I served on special Courts-Martial more than 20 years ago.

What you must follow in your own mind if there are quote mitigating unquote circumstances here would be the measure of proof as you could draw from the testimony given and the directions given to you by the Court with respect to the law, itself; the definition of reasonable doubt, the definition of the elements of both charges, and the application of the definition to the testimony, to the evidence presented both as to the definitions as to the elements and reasonable doubt as I defined that for you, but there are no mitigating circumstances as such that are described by statute that would be part of the process of reasoning by which you would arrive at your verdict.

THE FOREMAN: Okay, I think that is an acceptable answer to our question, your Honor." (N.T. 279–80). Following this exchange, appellant's counsel requested the court to "advise the Jury that if they have a reasonable doubt as to the Defendant's guilt, then he should be given the benefit of that doubt." (N.T. 281). The court refused to do so, noting that it had twice instructed the jury on this in its initial charge.

Appellant now concedes that the judge was correct in stating that there are no specific mitigating circumstances mentioned in the applicable statute, but argues that the court "should have pointed out clearly and unmistakeably, as he had been requested to do by trial counsel . . . that the jury might find facts 'mitigating' against guilt beyond a reasonable doubt." (Brief for Appellant at 17). We disagree.

Although appellant couches his objection in terms of "mitigating circumstances", it is clear that he continues to take issue with the court's exposition of "reasonable doubt." A reading of the original charge, however, convinces us that the court copiously covered that point on two occasions. The

court could not have provided a more comprehensive response to the jury's question without reiterating large portions of the initial charge, a duty which we have never imposed on the trial judge. *Commonwealth v. Toney*, 439 Pa. 173, 266 A.2d 732 (1970); *Commonwealth v. Borris*, 247 Pa.Super. 260, 372 A.2d 451 (1977). Reading the charge as a whole *Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508 (1978); *Commonwealth v. Dougherty*, 259 Pa.Super. 88, 393 A.2d 730 (1978), we can perceive of no error.

Appellant finally objects to references during trial which indicated that the offense was perpetrated at the "Sons of Satan" clubhouse, arguing that such information was irrelevant to the charges and highly inflammatory in light of the connotations of the name. We note preliminarily that during a pre-trial conference in chambers, appellant's counsel requested that because the location of the crime was undisputed, no reference to the "Sons of Satan" be allowed at trial. The request was denied, with the trial judge suggesting that an objection be made at the first mention of the name at trial with a continuing objection being had thereafter. In fact, no objection was made when the assistant district attorney first mentioned the club at trial. Any argument based on that incident is therefore waived. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

The second reference occurred during the cross examination of appellant. In response to the question, "What clubhouse is this?", he testified that it belonged to the Sons of Satan Motorcycle Club. Appellant then immediately denied any membership in the club. Some six questions later, appellant's counsel interposed an objection to the reference, requesting either a mistrial or curative instructions, neither of which were granted by the trial court. (N.T. 137–39).

It is quite true, as appellant notes, that evidence which is logically relevant should be excluded when it would so inflame the minds of the jurors that its probative value is outweighed by unfair prejudice. *Commonwealth v. Bryant*, 461 Pa. 3, 334 A.2d 603 (1975); *Commonwealth v. Smalls*, 460 Pa. 436, 333 A.2d 853 (1975); *Commonwealth v. Hickman*,

453 Pa. 427, 309 A.2d 564 (1973); *Commonwealth v. Wright*, 227 Pa.Super. 134, 323 A.2d 349 (1974). Because no rigid rule might be formulated to embrace the infinite range of evidence which might be proffered, and because the trial judge is in a far superior position to assess any possible prejudicial effect on the jury, we will not reverse the trial court's decision on admissibility absent an abuse of discretion *Commonwealth v. Sero*, 478 Pa. 440, 387 A.2d 63 (1978); *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977); *Commonwealth v. Pilosky*, 239 Pa.Super. 233, 362 A.2d 253 (1976); *Commonwealth v. Kinnard*, 230 Pa.Super. 134, 326 A.2d 541 (1974).

▮ Instantly, we can perceive of no such abuse. It was proper to inform the jury of the location of the offense, and the appellation "Sons of Satan" is not of such a lurid or morbid character to irretrievably prejudice the jury toward appellant, particularly in view of appellant's emphatic denial of membership.

Judgment of sentence is therefore affirmed.

SPAETH, J., files a concurring opinion.

SPAETH, Judge, concurring:

I concur in the result reached by the majority on all the issues raised on this appeal. I wish, however, to indicate specifically the limits of my agreement with the majority's conclusion that appellant's right to due process of law was not violated by 18 C.P.S.A. § 3104 (Supp.1979–80).

The United States Supreme Court has held that

[i]t is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazards of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.

*Wardius v. Oregon*, 412 U.S. 470, 476, 93 S.Ct. 2208, 2213–14, 37 L.Ed.2d 82 (1973).

Such a requirement violates the defendant's right under the fourteenth amendment to the United States Constitution to

due process of law. *Id. See also Commonwealth v. Contakos*, 455 Pa. 136, 314 A.2d 259 (1974). The majority concludes that "any analogy to *Wardius* and *Contakos* is inappropriate." At 372. I suggest, however, that the reasoning in support of this conclusion is not persuasive.

The majority says that evidence of an alibi defense, which was what was involved in *Wardius* and *Contakos*, "is fundamentally different from" evidence of prior consensual sexual intercourse. At 371. The difference does not seem to me so great. Both sorts of evidence bear directly upon an essential element of the offense.

It is true that section 3104 is not intended to be a discovery device for the Commonwealth; its purpose is to avoid confusion of issues at trial and needless embarrassment of the prosecutrix by excluding irrelevant (or at best marginally relevant) evidence concerning the prosecutrix's prior sexual behavior. It is also true that in providing that a defendant who wishes to offer evidence of the prosecutrix's past sexual relations with him may file a written motion and offer of proof *at the time of trial*, and in further providing that the motion, offer of proof, and subsequent hearing shall address only "the relevance and admissibility of the [defendant's] proposed evidence," section 3104 minimizes the risk that the Commonwealth will gain unfair pre-trial discovery of the defendant's case. Nevertheless, it is easy to suppose a case where the Commonwealth might convert the evidentiary proceedings under section 3104 into a discovery device. Suppose, for example, a case in which the defendant makes an offer of proof that he and a friend will testify that the prosecutrix had consensual sexual intercourse with the defendant in the defendant's home the day before the alleged rape, and further, that the friend knows this because he witnessed the act. A hearing is held, and the court rules that the proposed evidence is relevant and admissible on the issue of the prosecutrix's consent at the time of the alleged rape. Then, while trial is being held, the Commonwealth conducts an investigation for evidence to rebut the friend's proposed testimony. Through the investi-

gation, the Commonwealth discovers that the friend's mother is willing to testify that her son could not have witnessed sexual relations between the prosecutrix and the defendant because on the day in question her son was with her in a city a hundred miles away from the defendant's home. Were the Commonwealth to introduce the mother's testimony without giving the defendant timely notice that it intended to do so, I should question whether the Commonwealth's exploitation of the procedures under section 3104 was not forbidden by *Wardius* and *Contakos*, for the defendant would have been required "to divulge the details of his own case while at the same time [being subjected] to the hazards of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." *Wardius v. Oregon, supra,* 412 U.S. at 476, 93 S.Ct. at 2213.

I am not sure how I should decide a case such as the one I have just supposed. I submit, however, that we should not do as the majority does, which is to decide it now. Instead, we should decide each case as it arises, and on its particular facts, for in some case, contrary to the majority, an analogy to *Wardius* and *Contakos* may be most appropriate.

I concur in the result reached by the majority because when the particular facts of this case are examined, it will be seen that appellant was not required "to divulge the details of his own case while at the same time [being subjected] to the hazards of surprise . . . ." Immediately before trial, appellant filed a written motion and offer of proof that prior to the rape the prosecutrix had had sexual intercourse with him. An *in camera* hearing was held at which appellant testified concerning the incident. The lower court ruled that the testimony was relevant and admissible, and at trial, appellant repeated the testimony. The district attorney cross-examined appellant briefly concerning the date and time of the prior intercourse and possible corroborating witnesses. In rebuttal, the Commonwealth recalled the prosecutrix, who denied having inter-

**220**

course with appellant prior to the rape.* Thus, the Commonwealth's impeachment of appellant's testimony of prior sexual intercourse with the prosecutrix took an entirely predictable course. First, the district attorney explored on cross-examination the weaknesses of appellant's testimony. Second, the prosecutrix, on rebuttal, denied the incident. No unexpected cross-examination. No surprise witnesses. Appellant complains that the district attorney's cross-examination may have been sharper, and the prosecutrix's rebuttal better prepared, because of the Commonwealth's foreknowledge of his proposed testimony. Assuming that this was so, it did not, I think, confer the kind of advantage one would denominate "fundamentally unfair."

---

* It appears from the reproduced record that the prosecutrix was the only witness called on rebuttal.