433 A.2d 1382

**COMMONWEALTH of Pennsylvania,**

v.

**Edward ROZANSKI, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 5, 1981.

Filed Aug. 28, 1981.

Petition for Allowance of Appeal Denied Nov. 30, 1981.

James F. McBride, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, BROSKY and HOFFMAN, JJ.

SPAETH, Judge:

This is an appeal from nineteen separate judgments of sentence for robbery. Appellant, assigning several trial errors, asks for a new trial. We have concluded, however, that he had a fair trial, and therefore affirm.

■ On a motion for new trial we must regard the evidence in the light most favorable to the Commonwealth as the verdict winner. *Commonwealth v. Strube*, 274 Pa.Super. 199, 418 A.2d 365 (1979) *cert. denied, Strube v. Pennsylvania*, 449 U.S. 992, 101 S.Ct. 527, 66 L.Ed.2d 288 (1980). So regarded, the evidence may be summarized as follows.

During the fall of 1976 appellant approached John Segal, who was about 90 years old and a proprietor of a sweater shop in the Kensington section of Philadelphia, and asked for ten dollars to help him support his "habit." Feeling sorry for appellant, Segal gave him money to "help him out." N.T. 164. Appellant returned again and again, requesting ever increasing amounts of money. At first appellant only appealed to Segal's sense of charity. Later he made promises of repayment and gave assurances that he would ask nothing more. Finally, beginning in the summer of 1978, he threatened Segal with violence. In September 1978 Segal became ill and entered a hospital; he was not released until late November.

While Segal was hospitalized appellant called St. Stephen's Church in Philadelphia. When his call was answered by the Church's telephone answering machine, he left the following message:

Today I will be down to your church. I found out how much money you got in your bank account. I want you to write me out a check for eight hundred fifty dollars. I

need it for my personal needs, to get back on my feet, because I was just out of jail, and I will really appreciate it if you put ten dollars to get by for today. And you better have it or else I'm going to blow your church right up, so help me God. You understand that? I will do that. I found out how much money you got, so you can come up with a check for—. That is all I got to say. I'll be down a little later. Do it. You better have it or else there is going to be trouble. See you.

N.T. 261–63.

Appellant later confronted Reverend Hendricks, the Rector of St. Stephens, and threatened to "blow-up" the church unless he was given $850. N.T. 253–55. Reverend Hendricks refused to give appellant any money and instead reported the incident to the police. N.T. 258.

After Segal was released from the hospital, appellant resumed his demands for money. He threatened to kill Segal, and to "blow your home up with you in it." N.T. 173–74. He also displayed a gun to Segal, and threw a brick through his shop window saying, "You see how easy it is to get money from you." N.T. 175.

Throughout December 1978 and January 1979 appellant came to Segal's shop and took Segal's proceeds for the day. N.T. 171, 177–78. Finally, appellant forced Segal to withdraw money from his savings account. N.T. 180–94, 231–33, 243. The bank personnel, suspicious of Segal's uncharacteristically frequent withdrawals of his savings, notified the police. N.T. 200–01, 238, 281–88, 294–96, 301–06. In response, two detectives visited Segal's shop. While the detectives were there, appellant arrived. Noticing that Segal became visibly upset at seeing appellant, the detectives questioned Segal concerning appellant. When Segal told them what had been happening, they arrested appellant.

Each of the nineteen separate convictions for robbery was based on a withdrawal that appellant forced Segal to make from his savings account between January 12 and February 26, 1979. During this period alone, appellant received approximately $28,000 from Segal.

*b*

Appellant, testifying in his own defense, did not deny receiving the money but said that Segal had voluntarily given him it. N.T. 350.

–1–

■ Appellant first argues that it was error for the lower court to admit into evidence the tape recorded message that appellant left for the rector of St. Stephens Church because, according to appellant, its admission violated the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. §§ 5701–5705. This argument is without merit. It is not unlawful to "intercept a wire or oral communication, where all the parties to the communication have given prior consent to such interception." 18 Pa.C.S.A. § 5704(4). Here appellant concedes that all the parties consented to have his communication recorded. Nothing in the Act prohibits the disclosure or use of lawfully obtained evidence.

–2–

Appellant next argues that it was error for the lower court to admit the tape recorded message because it "was an irrelevant and impermissible reference to prior criminal activity and severely prejudiced" appellant. Brief for Appellant at 7.

■ The general rule is that the Commonwealth may not introduce evidence of a crime that is distinct from the crime for which the defendant is being tried. *Commonwealth v. Fuller*, 479 Pa. 353, 388 A.2d 693 (1978); *Commonwealth v. Terry*, 462 Pa. 595, 342 A.2d 92 (1975); *Commonwealth v. Groce*, 452 Pa. 15, 303 A.2d 917 (1973); *Commonwealth v. Peterson*, 453 Pa. 187, 307 A.2d 264 (1973) (plurality opinion); *Commonwealth v. Wable*, 382 Pa. 80, 114 A.2d 334 (1955); *Commonwealth v. Bastone*, 262 Pa.Super. 590, 396 A.2d 1327 (1979); *Commonwealth v. Bond*, 261 Pa.Super. 311, 396 A.2d 414 (1978). This rule is an application of the principle that prohibits the initial introduction by the prosecutor of evidence of bad character.

[C]haracter is never an issue in a criminal prosecution unless the defendant chooses to make it one (Wigmore,

Evidence, vol. 1, §§ 55, 192). In a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar . . . . The principle . . . is one, not of logic, but of policy (Wigmore, vol. 1, §§ 57, 194; *People v. Richardson*, 222 N.Y. 103, 109, 110, 118 N.E. 514). There may be cogency in the argument that a quarrelsome defendant is more likely to start a quarrel than one of a milder type, a man of dangerous mode of life more likely than a shy recluse. The law is not blind to this, but equally it is not blind to the peril to the innocent if character is accepted as probative of crime. "The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge" (Wigmore, Evidence, vol. 1, § 194, and cases cited).

*People v. Zackowitz*, 254 N.Y. 192, 197, 172 N.E. 466, 468 (1939) (CARDOZO, J.).

■ It is often said that there are exceptions to this general rule, and that evidence of a distinct crime may be admitted when it tends to prove

(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial—in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Commonwealth v. Peterson, supra*, 453 Pa. at 197–98, 307 A.2d at 269.

As Professor McCormick has pointed out, however,

[t]here are numerous other purposes for which evidence of other criminal acts may be offered, and when so offered the rule of exclusion is simply inapplicable.

McCormick on Evidence § 190 at 447–48 (2d ed. E. Cleary 1972).

McCormick goes on to list "[s]ome of these purposes"—he identifies ten—with the

warning . . . that the list is not complete, for the range of relevancy outside the ban is almost infinite; and further that the purposes are not mutually exclusive, for a particular line of proof may fall within several of them. McCormick, *supra* at 448.

Finally, McCormick notes that

some of the wiser opinions (especially recent ones) recognize that the problem is not merely one of pigeonholing but one of balancing . . . .

[Thus the trial judge should] exclude the other-crimes evidence, even where it has substantial independent relevancy, if in his judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial. McCormick, *supra* at 453–55 (footnote omitted).

*And see Commonwealth v. Bond, supra; Commonwealth v. Hude,* 256 Pa.Super. 439, 390 A.2d 183 (1978).

In explaining the admission into evidence of appellant's threat to blow up St. Stephens Church unless he was given money, the lower court said:

Certainly, the events were similar. They occurred almost extemporaneously, each contained an identical motive and intent. The scheme for obtaining money was common to both, the plan and design were identical. Each proved the intent and motive of the other.
Slip op. at 3.

■ Although we agree with the lower court that the evidence was admissible, we do not consider it admissible as within the "common scheme, plan or design" exception. It is not enough to prove a common scheme to show that two incidents had a common motive—for example, the desire for money. If it were enough, the exception would swallow the

rule; a defendant charged with one robbery could always be shown to have committed another; the argument would be that the two crimes were part of a "scheme" to get money. *Commonwealth v. Bond, supra.* Instead, there must be proof of a causal connection between the incidents; they must be shown to be "so related to each other that proof of one tends to prove the others." *Commonwealth v. Peterson, supra,* 453 Pa. at 197–98, 307 A.2d at 269. *See Commonwealth v. Brown,* 462 Pa. 578, 342 A.2d 84 (1975) (defendant, fleeing scene of one crime, with police in pursuit, enters apartment and commits various other crimes in effort to escape; all admissible); *see also Leonard v. United States,* 324 F.2d 911 (9th Cir. 1963) defendant obtained Treasury checks payable to others, induced A to forge payees' endorsements, then induced B to obtain false credentials, cash checks, and split proceeds; all admissible to show scheme); *State v. Toshishige Yoshino,* 45 Haw. 206, 364 P.2d 638 (1961) (defendant and accomplices robbed A and obtained from him B's address as holder of other money, proceeded to B's house where they robbed B; evidence of first robbery admissible at trial for second); *Haley v. State,* 84 Tex.Cr. 629, 209 S.W. 675 (1919) (at trial for murder, evidence that defendant also planned to continue illicit relations with wife of deceased, and to kill his own wife, would be admissible).

Here evidence of appellant's past acts of extortion or robbery *against Segal* was admissible as within the common scheme exception. Clearly, appellant had formed a scheme, of which the several extortions or robberies were all a part, to extract money from Segal. Appellant's threat to the church, however, was a distinct act and not part of that scheme.

■ The lower court was correct, however, in saying that the evidence of appellant's threat to the church was admissible as within the "intent" exception. As has been mentioned, appellant did not deny receiving the money but said that Segal had given him it. He testified that he first asked Segal for money because "[o]ther kids in the neighborhood told me . . . he helps kids out that need money . . . if you

tell him you have a habit, he gives you money," N.T. 346; that when he told Segal he needed money for drugs, Segal "gave the money to me," N.T. 348; that he never threatened or hit Segal N.T. 349–50; that he knew Segal well and considered him his friend, N.T. 353; and that he did not realize he was hurting Segal, N.T. 354. The evidence of appellant's threat to the church, however, tended to show that appellant did not intend to appeal to Segal's sense of charity—his willingness to help out someone who needed money for drugs—but his sense of fear. Usually a jury must decide what was the defendant's intent by considering how the defendant acted. Here, Segal had acknowledged that in the beginning appellant did in fact appeal to his sense of charity, but according to him, as time went on their relationship changed to one in which appellant terrorized him. Evidence that appellant attempted to terrorize the church, during the very period when Segal said appellant was terrorizing him, was relevant in appraising the credibility of Segal's testimony on how appellant acted. Especially was this so given the similarity in appellant's methods; the tape recording showed appellant threatening to "blow your church right up;" Segal testified that appellant threatened to "blow your home up with you in it" N.T. 173.

■ The question remains whether, although relevant to the issue of appellant's intent, the evidence of his threat to the church should nevertheless have been excluded because on balance, *Commonwealth v. Bond, supra, Commonwealth v. Hude, supra,* its relevance was outweighed by the passion it would stir in the jury.

We should find this question difficult if appellant had not testified. As McCormick points out,

> [W]hen the crime charged involves the element of knowledge, intent, or the like, the state will often be permitted to show other crimes in rebuttal, after the issue has been sharpened by the defendant's giving evidence of accident or mistake, more readily than it would as part of its case in chief at a time when the court may be in doubt that any real dispute will appear on the issue.

McCormick, *supra* at 452 (footnote omitted).

Among the cases cited by McCormick in support of this statement is *Thompson v. The King*, App.C. 221, 232 (1918), where Lord Sumner said:

> Before an issue can be said to be raised, which would permit the introduction of such evidence so obviously prejudicial to the accused, it must have been raised in substance if not in so many words, and the issue so raised must be one to which the prejudicial evidence is relevant. The mere theory that a plea of not guilty puts everything material in issue is not enough for this purpose. The prosecutor cannot credit the accused with fancy defences in order to rebut them at the outset with some damning piece of evidence.

Here, however, appellant did testify, and the issue of his intent was indeed "sharpened" by his testimony. The question, therefore, reduced itself to a matter of order of proof. For if the evidence of appellant's threat to the church had not been offered by the Commonwealth as part of its case in chief, it could have been offered in rebuttal.

One other factor must be considered in appraising the prejudice to appellant. In instructing the jury, the trial judge said:

> [Y]ou're not here to try the question of whether or not Father Hendricks' church was going to be blown up. You're here to say only what happened on these offenses that are charged in this case. If you accept the testimony of Father Hendricks, you may deduct from that that this defendant was engaged in a common scheme or design of extorting money, of robbing people, whichever you see as occurring under the testimony here, or you may disregard the testimony of Father Hendricks and rely exclusively on the testimony of Mr. Segal, or you may combine both of their testimony [*sic*] and decide from all the evidence.
>
>    . . . .
>
> So, you're here to try only this case before you. The 19 charges that were presented to you. You have no power

to convict this defendant of something with which he is not charged . . . .

N.T. 456–57.

It is true, for the reasons we have discussed, that the judge should have said that the evidence of appellant's threat to the church could be used to deduce his intent when asking for money from Segal, instead of to deduce "a common scheme or design of extorting money." However, no exception was taken to this aspect of the charge. The important point now is that the charge plainly stated that the jury was to make only a limited use of the evidence of appellant's threat to the church.

On balance, we conclude, appellant was not so prejudiced by the evidence of his threat to the church as to require that he be granted a new trial.

–3–

Appellant next argues that he was denied a fair trial because the assistant district attorney referred to his incarceration and therefore implied that appellant had a prior criminal record. The record, however, does not support this argument.

■ During direct examination Segal testified, over appellant's objection, that two days after appellant was arrested he called Segal collect and again threatened him if he did not give appellant $850. N.T. 206–207. Neither Segal nor the assistant district attorney referred to appellant's incarceration during this examination. On cross-examination, appellant's counsel questioned Segal further on this subject:

Q. Now, two days after [appellant's arrest], I believe, you testified that you received a phone call?

A. Yes, after he was in jail, I received a phone call. One day after.

N.T. 240.

Counsel for appellant did not object to this reference, nor do we suggest he should have, for while it certainly suggested that appellant was in jail because of his arrest, it did not suggest that he had a prior criminal record.

■ When appellant testified in his own defense, he continuously pleaded lack of memory. On direct examination he said that he could not remember how much money Segal had given him. N.T. 351. Also, he said he needed money to pay what he owed his drug dealer, but he could not remember how much he did owe. N.T. 350–51 & 355. On cross-examination he said that he had bought a car but did not remember where he got the money to pay for it, N.T. 357–58; nor could he remember why he was in Segal's store on the day of his arrest, N.T. 359; nor could he remember calling St. Stephen's Church, N.T. 363. When asked where his money was coming from, he replied, "I don't remember. I was using drugs heavy." N.T. 358. Near the end of cross-examination, the following dialogue took place:

Q. Do you remember the phone call that you made to [Segal]?

A. No, I don't.

Q. You don't remember being up the prison, calling him collect, telling him you wanted eight hundred fifty dollars?

A. No.

MR. McBRIDE: Objection, your honor.

THE COURT: Overruled.

MR. McBRIDE: Move for a mistrial.

THE COURT: Motion denied.

BY MR. CASTILLE:

Q. Why? Why don't you remember that? Were you out of it in prison?

MR. McBRIDE: Objection. Move for a mistrial.

THE COURT: Denied.

BY MR. CASTILLE:

Q. What?

A. For the first couple of days I was.

. . . .

Q. You don't get drugs up there, do you?

A. Yes.

N.T. 367–68.

This cross-examination was not improper. It tested appellant's claim of lack of memory, and although it referred to appellant's incarceration, the reference was plainly back to the earlier testimony indicating that appellant had been put in jail after his arrest; it did not suggest a prior criminal record.

Finally, in his instructions to the jury, the trial judge cautioned the jury

to keep in mind that any other offenses, if any of them here—and I know of none other than these offenses before you, that may seem to you have made references to any other offense or crime or occasion in jail, whatever, they're not relevant whatever to this case, and the only reference to jail and so forth have been [sic] solely referred to this case before you now, and the events that occurred immediately after this defendant was arrested. N.T. 457.

–4–

Appellant next argues that he was denied a fair trial because of prosecutorial misconduct. Appellant cites three instances in support of this argument.

■ Appellant argues that it was inflammatory for the prosecutor to ask him whether he could get drugs in prison. As we have said above, we think this question was proper. Appellant himself put his drug habit into evidence to explain his lack of memory. The question did not appeal to the jury's emotions, but rather tested appellant's excuse for not being able to remember his attempt, subsequent to his arrest, to extract still more money from Segal.

■ Appellant also argues that the prosecutor expressed his personal belief as to the veracity of appellant's testimony when he said, in closing:

I'm going to take his testimony and analyze it piece by piece, to show you the defendant did not follow his oath when he took, when he got on the witness stand, to tell you the truth, the whole truth and nothing but the truth.

N.T. 404.

There is no merit to this argument. The prosecutor did not by these words tell the jury that *he believed* appellant lied, but only that *by analysis of the testimony* he would demonstrate that appellant had not told the truth.

Appellant also argues that the prosecutor engaged in inflammatory conduct by repeatedly playing the tape recording of appellant's message to St. Stephen's Church. Brief for appellant at 22. There is no merit to this argument either. As we have discussed, this evidence was properly admitted. In any event, this objection has been waived because appellant has failed to cite to the record, advising us either at what point in the trial the asserted objectionable use of the evidence occurred, or in what manner his objection was preserved for appellate review. *See,* Pa.R.A.P. 2117(c)(4).

–5–

Finally, appellant argues that the trial judge erred in his charge to the jury on what constituted "reasonable doubt." The judge stated:

Good jurors, a reasonable doubt is that kind of doubt that would cause a reasonable man or woman in a matter of highest importance in their own life to be restrained from acting.

Appellant objects to the use of the word "restrained" instead of "hesitate." Brief for appellant at 23. There is no merit to this argument. *See, Commonwealth v. Cartagena,* 482 Pa. 6, 26, 393 A.2d 350, 360 (1978).

Affirmed.