458 A.2d 587

**COMMONWEALTH of Pennsylvania**

v.

**Sandra BASILE, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 17, 1982.
Filed March 25, 1983.

208

Neil E. Jokelson, Philadelphia, for appellant.

David M. McGlaughlin, Henry J. Schireson, Assistant District Attorneys, Philadelphia, for Commonwealth, appellee.

Before JOHNSON, MONTEMURO and MONTGOMERY, JJ.

JOHNSON, Judge:

Appellant was convicted by a jury on two counts of second degree murder.[1] Post verdict motions were denied and Appellant was sentenced to two consecutive terms of life imprisonment. This appeal followed.[2]

Viewing the evidence in the light most favorable to the verdict winner, *Commonwealth v. Parker,* 494 Pa. 196, 431 A.2d 216 (1981), the evidence reveals that Appellant and two others, Vicki Schmidt and Debbie Von Gober, plotted to rob a certain tavern on March 28, 1974. That night, the three women proceeded to the tavern and remained there until all

---

1.  18 Pa.C.S.A. § 2502(b).

2.  On January 19, 1983, this court denied the Commonwealth's Motion to Quash this appeal. The Commonwealth's Motion was based on allegations that Appellant had escaped from incarceration on December 8, 1982.

other patrons had left. Appellant and Schmidt, armed with hand guns, then opened fire on the owner and barmaid. The three then emptied the cash register, took the owner's wallet and proceeded to their car. Schmidt then informed the other two women that it was necessary to reenter the tavern to retrieve an empty gun cartridge. Appellant refused, and after Schmidt and Von Gober were unsuccessful in reentering the tavern, the parties fled. Both victims died of the gunshot wounds.

The three perpetrators were subsequently identified by the tavern's patrons as the last customers in the tavern on the night of the killings. Von Gober and Schmidt were traced by police to the home of a Warlock Motorcycle Club (hereinafter the Club) member in Windgap, Pennsylvania. They had gone to Windgap the same morning the murder victims were discovered. They were interrogated by police and denied involvement in the slayings. Appellant was located at her home with her husband, a former Club member. She too denied any involvement.

Police investigation also produced the empty gun cartridge which was found in the tavern. The police traced the marks on the empty cartridge and identified the gun which had been used to fire the cartridge. This trace indicated that Walter Rodriguez, a Club member, had purchased the gun. During questioning, Rodriguez told police he gave the gun to Thomas Schmidt, Vickie Schmidt's husband, in December of 1973. A search of the Schmidt residence uncovered the box to this gun, and a full clip of ammunition; however the weapon was never located.

On December 12, 1979, Von Gober voluntarily went to the police and confessed to the murders. Her first confession implicated herself and Appellant. Her second confession also implicated Vickie Schmidt, attributing the delay in implicating Schmidt to a recent death threat made to her by Schmidt.

In her second account, Von Gober described the conspiracy to rob the tavern, which occurred at the home of Club President Jay Centurione. She further described both the

crime and the cover-up which was subsequently organized over the next five and a half years by the Club community, most notably by Vickie and Thomas Schmidt, Jay Centurione and Appellant's husband, Harpo Basile.

Appellant raises three issues on appeal, namely: (1) whether the trial court erred in admitting evidence of allegedly prejudicial hearsay statements of Vickie Schmidt, which statements occurred after the commission of the crimes and inculpated Appellant, (2) whether comments made by the prosecution, in its opening and closing statements, concerning the role of the Club, the honesty and motivation of defense counsel, and the veracity of Appellant, amounted to prosecutorial misconduct, and (3) whether the trial court erred in instructing the jury not to consider the penalties attending a verdict of guilty to the murder charges.

As we find these arguments either to be meritless or to have been waived, we affirm.

## I.

Appellant alleges in her first argument that the trial court improperly permitted evidence of the out-of-court statements of Schmidt [3] to be introduced through the direct examination of the Commonwealth's witness Von Gober over defense counsel objection. The statements, according to Appellant, were hearsay, did not properly fall under any exception to the hearsay rule, and violated her rights under the Sixth Amendment to the United States Constitution.

The statements involved evidence that (1) Schmidt was in constant contact with Jay Centurione, who was coordinating the cover-up of the crimes,[4] (2) that Schmidt had given a gun used in the crimes to one Ron Foster to be melted down,[5] (3) that Schmidt had attended a Club meeting, not attended by Appellant, where it was determined whether

3. Vickie Schmidt did not testify at Appellant's trial.

4. N.T.Vol. III pp. 128–9.

5. *Id.* p. 128.

Von Gober would live or die as a result of her failure to follow Schmidt's instructions during the commission of the crime,[6] (4) that Schmidt had been at Appellant's home when the investigating trooper arrived for questioning and as a result of the questioning, Appellant was quite upset and crying and that Schmidt was sick and tired of Appellant's calls to her concerning Appellant's hysterical reactions to nightmares as a result of the crime,[7] (5) that Schmidt had stated that Appellant's husband and Jay Centurione were keeping a "tight hold" on Appellant,[8] and (6) that Schmidt had offered Von Gober $1,000 to set up the investigating trooper to be killed.[9]

Hearsay statements made by a co-conspirator are allowed to be admitted against an accused if the statements are made during the conspiracy, in furtherance thereof, and where there is other evidence of the existence of a conspiracy. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981); *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981); *Commonwealth v. Plusquellic*, 303 Pa.Super. 1, 449 A.2d 47 (1982); *Commonwealth v. Tumminello*, 292 Pa.Super. 381, 437 A.2d 435 (1981). This exception applies even where no party has been formally charged with conspiracy. *Dreibelbis, supra; Commonwealth v. Weitkamp*, 255 Pa.Super. 305, 386 A.2d 1014 (1978). Nor need the co-conspirator, whose declaration is testified to, be on trial. *Weitkamp, supra.*

To lay a foundation for the co-conspirator exception to the hearsay rule, the Commonwealth must prove that: (1) a conspiracy existed between declarant and the person against whom the evidence is offered, and (2) that the statement sought to be admitted was made during the

6. *Id.* p. 130.

7. *Id.* pp. 145, 148.

8. *Id.* p. 148.

9. *Id.* p. 154.

course of the conspiracy.[10] *Weitkamp, supra.* However, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed. *Plusquellic, supra.*

A conspiracy, for purposes of this exception, may be inferentially established by showing the relation, conduct or circumstances of the parties. *Dreibelbis, supra; Plusquellic, supra.* Such a conspiracy need only be proved by a fair preponderance of the evidence. *Commonwealth v. Hirsch,* 225 Pa.Super. 494, 311 A.2d 679 (1973). Also, when a conspiracy to commit a particular crime or crimes has been shown, each conspirator is responsible for the acts of his co-conspirators committed in furtherance of the conspiracy; the agreement is the nexus which renders a conspirator vicariously liable for the acts of his associates. *Plusquellic, supra.*

As stated in *Commonwealth v. Tumminello,* 292 Pa.Super. at 389, 437 A.2d at 439:

"In *Commonwealth v. Evans,* 489 Pa. 85, 413 A.2d 1025 (1980) our Supreme Court reaffirmed its approval of the use of evidence of a co-conspirator's attempt to conceal evidence *after the commission of a crime,* finding that such acts "c[a]me within the scope of the conspiracy to commit the crime." *Id.,* 489 Pa. at 92, 413 A.2d at 1028. In so doing, the *Evans* court directed that the following test be followed:

'The duration of a conspiracy depends upon the facts of the particular case, that is, it depends upon the scope of the agreement entered into by its members. Generally, the conspiracy ends when its principal objective is accomplished because no agreement to retain secrecy after the achievement of the unlawful end can be shown or implied by mere "acts of covering up." Thus in *Grunewald v.*

10. The additional requirement listed in *Commonwealth v. Ellsworth,* 409 Pa. 505, 187 A.2d 640 (1963), that the declaration must be in furtherance of the criminal purpose, is generally held to be met by proof that it was made during the existence of the conspiracy. McCormick on Evidence § 267 (2nd ed. 1972).

*United States,* supra, 353 U.S. [391] at 402, 77 S.Ct. [963] at 972, [1 L.Ed.2d 931 (1957),] the Supreme Court stated, "Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." But the fact that the "central objective" of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such agreement may reasonably be inferred, the conspiracy may be found to continue. *Atkins v. United States,* 307 F.2d 937, 940 (9th Cir.1962); cf., *United States v. Allegretti,* 340 F.2d 254, 256 (7th Cir.1964), *cert. denied,* 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965).... The crucial factor is the necessity for some showing that the later activities were part of the original plan.' " (Footnote omitted) (Citations omitted) *Id.,* 489 Pa. at 92–93, 413 A.2d at 1028–29.

■ The facts in the instant case clearly establish that a conspiracy existed, *and continued,* involving (1) commission of the robbery and (2) a cover-up of the robbery and murders. The evidence indicates that practically all parties involved in the crime and the cover-up were related to the Club in some way. Schmidt and Appellant were both married to members or former members of the Club. The initial part of the conspiracy was planned at the home of the Club president. Appellant was present when Schmidt spoke of reentering the tavern immediately after the crimes. The stolen money was divided at Appellant's home in her presence. A meeting of Club members (excluding Appellant) was held concerning whether Von Gober would live or die for her failure to follow orders during the crime. Appellant was present at a meeting of various co-conspirators where Schmidt offered to pay for the "setting up" of the investigating trooper. From this and other evidence, we conclude

that a conspiracy clearly existed and Appellant was a part of that conspiracy. Also, the conspiracy did not terminate with the commission of the crimes, but continued until Appellant's arrest. *See Commonwealth v. Dreibelbis, supra; Commonwealth v. Tumminello, supra.*

Therefore, the statements made by Schmidt were admissible under the co-conspirator exception to the hearsay rule against Appellant.

■ Appellant's claim that the admissions of the statements violated her Sixth Amendment right of confrontation has been waived for Appellant's failure to specifically raise the issue in either her initial or supplemental post-trial motions. *Commonwealth v. Dunston,* 496 Pa. 552, 437 A.2d 1178 (1981); *Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975).

## II.

The second issue raised by Appellant concerns certain remarks made by the prosecutor in his opening and closing statements allegedly amounting to prosecutorial misconduct. Specifically, Appellant alleges that the remarks in question (1) improperly emphasized the role of the Club, (2) impugned the honesty and motivation of defense and (3) indicated the prosecutor's personal belief that Appellant had lied on the witness stand.

Appellant has referred to seven instances [11] where the prosecutor mentioned the Club:

(1) You will hear, Ladies and Gentlemen, that these three women had one common bond. They were all the women of the members of motorcycle clubs. N.T.Vol. I p. 9.

(2) The three of them road [sic] to the home of one Jay Centurione, also a member of the Warlock Motorcycle Club. N.T.Vol. I p. 11.

(3) ... Walter Rodriguez ... went into a store ... and bought a pistol. The owner of that store recognized him

---

**11.** Remarks 1–3 appear in the prosecutor's opening statement; remarks 4–7 in the closing statement.

as a Warlock, didn't want to sell him the gun ... the owner ... called the State Police, and told them that he didn't want to sell a pistol to this man and did he have to sell him a pistol. N.T.Vol. I p. 21.

(4) And they were people who kept arsenals. They were people to be feared, Ladies and Gentlemen. I submit if you look at the evidence, if you look at the type of people the Warlocks were, it's eminently understandable why Debbie Von Gober wanted to kill herself ... N.T.Vol. V p. 90.

(5) Remember, these are all women of motorcycle men. These aren't the three average high school girls. N.T. Vol. V p. 92.

(6) Jay coordinating what the girls were to say, Papa Jay, coordinating. It was the Warlocks network taking over to protect their own. N.T.Vol. V p. 120.

(7) The Commonwealth submits that Debbie Von Gober didn't make any mistake that was material, she didn't make any mistake, she didn't have any fault in her recollection that should cause this jury to have a reasonable doubt. She says they went to the bar, and indeed they did go to the bar. They went there together. She said they had a discussion, a discussion at Jay Centurion's [sic] house, the Warlock Jay Centurion [sic]. And at that house they discussed the robbery. N.T.Vol. V p. 94.

■ We note that no specific objection was made to the fourth or fifth remark and therefore, those remarks have not been preserved for review. *See Commonwealth v. Youngkin*, 285 Pa.Super. 417, 427 A.2d 1356 (1981); *Commonwealth v. Hughes*, 268 Pa.Super. 536, 408 A.2d 1132 (1979).

Appellant argues that the remaining references to the Warlock Motorcycle Club by the prosecutor were inflammatory, improperly arousing the jury's fears by suggesting that Appellant was dangerous because of her association with the Club.

■ As stated in *Commonwealth v. Youngkin,* 285 Pa. Super. at 430, 427 A.2d at 1362:

> [W]e have always recognized that not every intemperate or uncalled for remark by the prosecutor requires a new trial. Rather, "[t]he language must be such that its 'unavoidable effect would be to prejudice the jury forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.'" Moreover, the effect of such remarks is largely dependent upon the atmosphere at trial, and the proper action to be taken, upon objection, is within the discretion of the trial court. Finally, when the cumulative effect of any improper remarks so prejudices the jury as to prevent a fair trial, reversible error exists. (Citations and footnote omitted)

■ Upon a review of the entire record, it is apparent that Appellant's connection with the Club was both relevant and material to the charges against her. Also, upon reviewing the references made by the prosecutor, we cannot say that in the context of the instant trial, they were so inflammatory or prejudicial so as to require a new trial. *See Commonwealth v. Gwaltney,* 497 Pa. 505, 442 A.2d 236 (1982) (evidence of gang activity held admissible); *see also Commonwealth v. Johnson,* 496 Pa. 546, 437 A.2d 1175 (1981).

Appellant's second allegation of prosecutorial misconduct concerns statements allegedly impugning the honesty and motivation of the defense.

> The remarks [12] raised by Appellant in his brief state: (1) The interests of the Commonwealth and the interests of the defense in this case are in some ways similar, and in some ways different. As an Assistant District Attorney, I represent the Commonwealth of Pennsylvania. And the Commonwealth demands no victories, Ladies and Gentlemen. We seek justice, equal justice, impartial justice. N.T.Vol. V pp. 79–80.

12. All remarks appear in the prosecutor's closing statement.

(2) Mr. Jokelson examined the evidence, as he saw it. He is a very able and articulate lawyer. He presented his client's case exceptionally well. He has cast the evidence in a light favorable to his client, and I submit to you in some cases cast it inaccurately. N.T.Vol. V p. 80.

(3) It is easy in a case of this magnitude, Ladies and Gentlemen, to be diverted. It's easy to get hung up on details. It's easy to poke holes. It's easy to criticize the conduct of the police six years later. It's very easy, too easy to do. N.T.Vol. V p. 81.

(4) I ask you, Ladies and Gentlemen, to resist being diverted by the arguments of Mr. Jokelson. I ask you to look at the evidence and look at the important evidence, look at the evidence that Mr. Jokelson can't explain away, the evidence he glosses over.... As I said, he is an able attorney. He cross-examined the witnesses thoroughly. He nit picked, he picked and picked and picked and picked at every witness. You saw that. N.T.Vol. V pp. 81–2.

(5) Mr. Jokelson had stacks of paper, stacks of accounts over that six years from which to nit pick, and nit pick he did. I suggest to you, Ladies and Gentlemen, it's a smoke screen. N.T.Vol. V p. 84.

(6) You can't cross-examine this, Ladies and Gentlemen. You can't pick at this. N.T.Vol. V p. 105.

(7) And, as I said in the beginning, you will see that no innocent person suffers, and you will see that no guilty person escapes, because the evidence in this case justifies no other conclusion, Ladies and Gentlemen, if you use your common sense and you don't get diverted. Don't go down those side roads. N.T.Vol. V p. 136.

We again note that Appellant has failed to preserve by specific objection all but the fifth and seventh remarks.

■ A number of cases in Pennsylvania have granted new trials because of prosecutorial misconduct involving statements somewhat similar to these complained of instantly. *See e.g. Commonwealth v. Long,* 258 Pa.Super. 312, 392 A.2d 810 (1978); ("Don't allow the defendant to sneak out ... under the cover of smoke"); *Commonwealth*

*v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975) (reference to "smoke screen"). However, no *per se* rule has been adopted with respect to such alleged improper remarks. Upon a review of the allegedly improper remarks in context of the trial as a whole, we find the instant case distinguishable from those where a new trial has been granted. The remarks *by themselves* were not of such a character as to inflame the passion and prejudices of the jury, nor were they capable of seriously misleading or distracting the jury. *See Commonwealth v. Middleton,* 269 Pa.Super. 17, 409 A.2d 41 (1979).

Those remarks made by the prosecutor, while questionable, "were neither so strong nor abusive that their unavoidable effect, individually or cumulatively, was to unduly influence the jury so that they could not fairly weigh the evidence and render a true verdict." *Commonwealth v. Youngkin,* 285 Pa.Super. at 434, 427 A.2d at 1364.

■ Appellant's final claim of prosecutorial misconduct concerns statements allegedly indicating the prosecutor's personal belief that Appellant had lied on the witness stand:

The trooper says he opened that door when other witnesses say that door was closed. Either it was closed or open. He is either lying or telling the truth. And we submit that they have no motivation to lie, no motivation to lie. We submit there is only one person lying, one person alone in this courtroom with a motive to lie, and that you heard from that person this morning, and you heard an account that was incapable of verification, an account so vague that it didn't even admit of proper cross-examination. N.T.Vol. V p. 134.

Again, viewing this remark in the context of the entire trial, we find that any error was harmless. Firstly, the comment did not involve a statement of the prosecutor's personal belief. Secondly, the comment was a single isolated incident. Although questionable, the statement does not warrant the granting of a new trial. *See Commonwealth v. Rozanski,* 289 Pa.Super. 531, 433 A.2d 1382 (1981).

220

## III.

Appellant's third issue concerning the trial court's instructions to the jury has been waived for Appellant's failure to include this issue in either her Motion for a New Trial and Arrest of Judgment or her Supplemental Motions. *See* Pa.R.Crim.P. 1123(a); *Commonwealth v. Blair, supra; see also Commonwealth v. Cargo,* 498 Pa. 5, 444 A.2d 639 (1982) (submission of statement of matters complained of on appeal is not sufficient to preserve claim of error for appellate review).

Judgment of sentence of February 9, 1981 is affirmed.