J-S42011-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ABDULLAH R R. MUHAMMAD, | |
| Appellant | No. 2257 EDA 2014 |

Appeal from the Judgment of Sentence March 24, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005853-2012

BEFORE: SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED SEPTEMBER 14, 2015**

Appellant, Abdullah R R. Muhammad,[1] appeals from the judgment of sentence entered following his convictions of first-degree murder, conspiracy, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possession of an instrument of crime ("PIC"). We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We note that throughout the certified record before us various documents refer to Appellant as: "Abdullah R R. Muhammad," "Abdullah R. R Muhammad," "Abdullah R. R. Muhammad," "Abdullah R. Muhammad," and "Abdullah Muhammad."

We summarize the history of this case as follows.[2]  In 2009, Appellant became romantically involved with co-defendant, Tania Boozer ("Boozer"). On three different occasions that year, Boozer arranged for her sister to purchase firearms on behalf of Appellant.  Boozer also purchased a life insurance policy that covered accidental death for her husband, James Hayward ("Victim").  On the morning of July 14, 2009, Victim was shot to death while walking on a Philadelphia street.  The deadly gunshots were seen coming from a vehicle matching the description of Appellant's car. Eleven days later, Appellant reported his vehicle as having been stolen.

On March 7, 2012, Appellant was arrested and charged with multiple crimes related to the above incident.  On March 24, 2014, Appellant was convicted of the crimes stated above.  That same day, the trial court sentenced Appellant to serve a mandatory term of life imprisonment without parole, and an aggregate consecutive term of incarceration of thirty-three and one-half to sixty-seven years.  Appellant filed post-sentence motions, which were denied by operation of law.  This timely appeal followed.  Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

_____

[2] For a more detailed presentation of the factual and procedural history of this matter, we direct the reader to the opinion authored by the trial court. **See** Trial Court Opinion, 12/23/14, at 1-11.

- 2 -

I. Did the lower court err in denying [Appellant's] request for a continuance so that counsel of his choice could enter an appearance and try the case?

II. Did the lower court err in admitting the acts of co-defendant, Tania Boozer, including the procurement of an insurance policy for the decedent; contacting the insurance company to inquire if, "getting shot was an accident" under the policy; the doctoring of police reports; and moving to Virginia when the Commonwealth failed to introduce evidence demonstrating that said acts were objects of the conspiracy between [Appellant] and Boozer?

III. Did the lower court err in admitting evidence of a phone call which showed that [Appellant] was incarcerated on other charges prior to being to being [sic] arrested in this matter?

IV. Did the lower court err in denying defendant's request for a mistrial after the prosecutor's remarks in closing argument improperly shifted the burden of proof to [Appellant]?

Appellant's Brief at 3-4.

We have reviewed the briefs of the parties, the relevant law, the certified record before us on appeal, and the thorough opinion of the trial court dated December 23, 2014. It is our conclusion that each of the issues presented by Appellant lack merit, and the trial court's opinion adequately addresses Appellant's claims raised on appeal. Accordingly, we affirm on the basis of the trial court's opinion and adopt its reasoning as our own. The parties are directed to attach a copy of that opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/14/2015

CP-51-CR-0005853-2012 Comm. v. Muhammad, Abdullah R.R.
Opinion

## IN THE COURT OF COMMON PLEAS PHILADELPHI
## CRIMINAL TRIAL DIVISION



7238022501

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0005853-2012

      v. : SUPERIOR COURT

ABDULLAH MUHAMMAD :

       : 2257 EDA 2014

### OPINION

**Byrd, J.** **December 23, 2014**

Abdullah Muhammad filed a direct appeal from this court's October 1, 2013 judgment of sentence. In accordance with the requirements of PA. R.APP. PROC. 1925, this court submits the following Opinion.

## I. PROCEDURAL HISTORY

Defendant Abdullah Muhammad was arrested on March 7, 2012 and charged with a range of offenses.[1] On March 24, 2014, following a jury trial before this court, defendant was convicted of murder in the first degree, criminal conspiracy, carrying a firearm without a license, carring a firearm on public streets or public property in Philadelphia, and possession of instrument of crime. He was then sentenced to life imprisonment without the possibility of parole on the charge of murder in the first degree.[2] On March 29, 2014, defendant filed a Post-Sentence Motion and the motion was denied by operation of law on July 31, 2014. Defendant filed a Notice of Appeal

---

[1] Defendant was charged with (18 PA. CONS. STAT. ANN. § 2502(a-c) murder; § 903 (c) conspiracy to commit murder charge (which was changed to § 903 (a)(1) criminal conspiracy engaging; § 6105 (a)(1) possession of firearm prohibited; § 6106 (a)(1) carrying firearms without a license; § 6108 carrying a firearm on public streets or public property in Philadelphia; and § 907 (a) possession of instrument of crime.

[2] Defendant was sentenced to life imprisonment without the possibility of parole followed by a consecutive 33.5-67 years of imprisonment on the remaining offenses.



on August 5, 2014. This court issued an order on August 6, 2014 directing defendant to file a Statement of Matters Complained of on Appeal in accordance with PA. R.APP. PROC. 1925 (b). On August 12, 2014, said statement was filed.

## II. FACTUAL BACKGROUND

At trial, the Commonwealth and defendant presented evidence, which when viewed in the light most favorable to the Commonwealth as the verdict winner, established the following.

James and Tania Hayward were in a long-term relationship that led to a marriage which was tested by financial troubles, Mr. Hayward's drug addiction and his infidelity which produced a child out of wedlock. *Id.* at 55-56. Co-defendant Tania Boozer Hayward, wife of decedent James Hayward, met defendant when she and her husband worked with him in 2007 at a firm called Gamesa. *N.T.* 3/19/14 at 58. Initially, Mrs. Hayward and defendant were simply coworkers but eventually, while Mr. Hayward was in and out of jail and unable to keep a steady job, they became romantically involved. *Id.* at 58-59. Sonjan Frederick, Mrs. Hayward's younger sister by approximately 12 years, moved into the Hayward residence at 1322 McKinley Street, at the age of 16 years-old. *N.T.* 3/19/14 at 51-54. In 2009, the Hayward residence was home to Mrs. Hayward, decedent, their three children, Ms. Frederick and her daughter. *Id.* at 55.

Ms. Frederick became involved in this case when Mrs. Hayward asked her to purchase a firearm on defendant's behalf. *Id.* at 58, 63. Mrs. Hayward informed Ms. Frederick that defendant was willing to pay her one hundred dollars for her participation in the transaction, and she acquiesced. *Id.* at 63-64. Approximately one week later, on February 26, 2009, defendant and Mrs. Hayward picked up Ms. Frederick in defendant's gold Dodge Durango with tinted rear windows and the three drove to the Ready, Aim, Fire gun store. *Id.* at 61, 69. Upon arrival, before entering the store, defendant gave Ms. Frederick $300.00 in cash to use towards the

2

*Commonwealth v. Abdullah Muhammad*

firearm's purchase. *Id.* at 65. Once the three entered the store, defendant pointed out the firearm he wanted Ms. Frederick to purchase and she initiated the *first* firearm transaction on his behalf. *Id.* at 65. Ms. Frederick purchased a Smith & Wesson M&P .45 caliber using the $300.00 in cash and the remaining cost was paid using defendant's credit card. *Id.* at 68, 70. After the purchase the three left the store, at which point Ms. Frederick, with the intent to relinquish control, gave defendant the gun and he put it in the trunk of his Durango. *Id.* at 74. The three then got back into the Durango and drove to defendant's apartment in Bensalem, Pennsylvania where Ms. Frederick received payment. *Id.* at 75. There she observed Mrs. Hayward's clothing and belongings in one of his closets. *Id.* at 76. Ms. Frederick also overheard defendant on the phone with his wife, Kamitra Muhammad, arguing about one of defendant's other firearms which was in his wife's name. *Id.* at 76.

On March 1, 2009, there was a *second* firearms transaction involving Mrs. Hayward, Ms. Frederick and defendant. *Id.* at 78-79. When the three arrived at the firearms store, defendant's wife was already inside filling out forms to transfer a Springfield Armory XD-.45 ACP (.45 caliber) handgun from her name to Ms. Frederick's name. *Id.* at 81-83; *N.T.* 3/20/2014 at 25. When the transaction was complete, Ms. Frederick exited the store, handed the firearm over to defendant and was paid $100.00. *N.T.* 3/19/14 at 86. On July 8, 2009, there was a *third* transaction using Ms Frederick and initiated by Mrs. Hayward on defendant's behalf. *Id.* at 88. Defendant picked up Mrs. Hayward and Ms. Frederick and, en route to the firearm store, indicated that he wanted to exchange the Smith & Wesson from the first transaction for a smaller firearm. *Id.* at 89. After entering the firearms store, defendant identified the handgun he wanted, a .38 Special Revolver, and Ms. Frederick gave the store clerk the Smith & Wesson and submitted the requisite forms. *Id.* at 91. However, this time her application was denied and the

*Commonwealth v. Abdullah Muhammad*

.45 Smith and Wesson was sold back to the firearms store. *Id.* at 95. All state and federal applications and records of sale and transfer for each firearm transaction were presented at trial *N.T.* 3/20/2014 at 14.

By July 14, 2009 Mr. Hayward had been released from prison and was home at 1322 McKinley Street for approximately one week. *N.T.* 3/19/14 at 96. On that morning, around 7 a.m. or 7:30 a.m., Ms. Frederick left 1322 McKinley Street to take her daughter to daycare. *Id.* at 98-99,184. While waiting at the bus stop, Ms. Frederick was surprised when defendant pulled up alongside her in his Durango and offered to give them a ride. *Id.* at 98-99. Ms. Frederick was not accustomed to seeing defendant in the neighborhood when her brother-in-law was home. *Id.* at 99. On the drive to daycare, defendant asked Ms. Frederick if Mrs. Hayward was going to leave her husband for him. He appeared upset when she answered in the negative and told him that Mrs. Hayward was "only playing with" him. *Id.* at 101. While driving from the daycare, defendant stated to Ms. Frederick "Tell Tania (Mrs. Hayward) it was nice knowing her, nice [her] knowing me," and that he would drop her clothes off when he returned from Newark. *Id.* at 102. Upon returning home, Ms. Frederick informed her sister of the above encounter with defendant. *Id.* at 102-103.

Around 8:00 a.m. Mrs. Hayward made a phone call, and later both women walked to Dunkin Donuts where defendant was waiting in his Durango in an adjacent parking lot. *Id.* at 103-104,185-186. Mrs. Hayward entered defendant's vehicle and Ms. Frederick entered the restaurant, where she remained for approximately five or ten minutes. *Id.* at 104, 186. After exiting Dunkin Donuts, Ms. Frederick entered defendant's vehicle, and Mrs. Hayward and defendant abruptly ended their conversation. Mrs. Hayward immediately exited the car and Ms.

4

*Commonwealth v. Abdullah Muhammad*

Frederick followed her. *Id.* at 105. On the walk home, Ms. Frederick asked Mrs. Hayward what defendant was doing in their neighborhood and she replied, "I don't know, [h]e's crazy."

Once they returned home, Mrs. Hayward got dressed and asked Ms. Frederick to accompany her to their older sister's house in the West Oak Lane section of Philadelphia. *Id.* at 106-107. The two exited their home and found defendant waiting outside in his Durango. *Id.* at 107. Upon entering defendant's vehicle, Ms. Frederick asked him if he was "taking them" and defendant replied, "I'm not taking you all. I'm going to get this nigga, James." *Id.* at 108. As he was making that statement, defendant was putting on a black skully hat and black gloves. *Id.* He then reached under his seat, grabbed a small black handgun and "chocked it back," making a racking motion with his hands. *Id.* Defendant then inquired into James Hayward's whereabouts and asked "where this nigga going to be at?" *Id.* at 109. Mrs. Hayward replied, "I don't know, [h]e got to go to PennDot and child support court." *Id.* Defendant then dropped the sisters off at a bus stop. *Id.* at 110.

While at the bus top, Ms. Frederick sat on a nearby step nervously rocking, when Mrs. Hayward asked her what was wrong, she replied, " I don't want to know this man (defendant) about go kill James. This aint something I [] want to know." *Id.* at 110. Mrs. Hayward, then stated with a giggle, "Yea, I know right." *Id.* at 110-111. Mrs. Hayward made several phone calls while waiting at the bus stop, including a phone call to their home where she stated to someone, "Is James up? Tell James to get up and go to PennDot to get his ID because he has child support court." *Id.* at 112; *N.T.* 3/20/2014 at 139-104. Sometime later, while waiting at the bus stop, Mrs. Hayward saw defendant drive past in his gold Dodge Durango and stated "Let me call this dummy." The call, however, went to voicemail. *Id.* at114-115; *N.T.* 3/20/2014 at 141. Eventually, the sisters left the bus stop and went back home to 1322 McKinley Street, where they

5

*Commonwealth v. Abdullah Muhammad*

saw a breaking news report about an unidentified man being shot in the area of the PennDot in Oxford Circle. *N.T.* 3/19/14 at 115. Despite the fact the shooting victim had not been identified in the news report, Mrs. Hayward stated to Ms. Frederick that she had an accident insurance policy on her husband. *Id.* at 116-117. Unsure whether a fatal gunshot wound was covered by the plan Mrs. Hayward picked up the phone and dialed her insurance company. *Id.* at 117-118. At Mrs. Hayward's request, Ms. Frederick then spoke to the representative and was informed that it was covered. *Id.* Mrs. Hayward subsequently indicated that she would be planning a funeral. *Id.* at 118.

Prior to the news report, at approximately 11:00 a.m. that morning, in the Northeast section of Philadelphia, residents of the Oxford Villa Projects were suddenly alarmed by the sound of two initial gunshots. *N.T.* 3/18/2014 at 50, 56, 74. A gold Dodge Durango slowly drove up to approximately twelve (12) feet from James Hayward, who was walking from the nearby PennDot.[3] A black male stuck his arm out of the passenger side window of the vehicle and fired a hand gun. *Id.* 58-60, 67, 74, 83, *N.T.* 3/20/2014 at 83. Decedent was seen dodging back and forth from behind a tree, attempting to avoid the bullets that were being fired at him. *N.T.* 3/18/2014 at 57-58. Residents reported hearing an additional seven (7) to ten (10) gun shots being fired at the victim. *Id.* at 59, 78. Bleeding profusely, decedent eventually fell to the ground and rolled around before he pushed himself inside a house at 6144 Oxford Avenue, where he stumbled onto a wall, slid down and fell to the floor in the living room of the house. *N.T.* 3/18/2014 at 50-51,80-81. The Good Samaritan residents of the home dialed 911, placed a towel over decedent's gunshot wounds and remained in his company until he took his last breath. *Id.* Decedent stopped breathing within seconds of entering the house. *Id.*

---

[3] Video footage obtained from PennDot on July 4, 2014 displayed decedent leaving PennDot at 10:59 a.m. and walking in the direction of the crime scene. *N.T.* 3/20/2014 at 160-161.

6

*Commonwealth v. Abdullah Muhammad*

At approximately 11:07 a.m., Officer Raymond Masciocchi received a radio call of shots fired in the area of 6100 Oxford Avenue, and within seconds he arrived on the scene and radioed for paramedics. *Id.* at 90-92. Upon entering the open door to 6144 Oxford Street, Officer Masciocchi observed decedent seated on the floor in a pool of blood with his back on the wall and half of his side leaning on the couch. *Id.* at 90, 99. Decedent had sustained gunshot wounds and was unresponsive. *Id.* at 91. Paramedics arrived and transported him to the Albert Einstein Medical Center where he was pronounced dead at 11:45 a.m. *Id.* at 103-104; *N.T.* 3/20/2014 at 33. At the hospital, officers recovered decedent's clothing and belongings and were able to identify him as James Hayward. *Id.* at 104.

Later that afternoon, Detective Crystal Williams went to the home at 1322 McKinley Street to notify Mrs. Hayward of her husband's death. *N.T.* 3/20/2014 at 10. Detective Williams testified that she was quite surprised by Mrs. Hayward unusually calm response upon notification. *Id.* Detective Williams testified that Mrs. Hayward did not exhibit any crying, falling out or other typical reactions she normally observes when making death notifications. *Id.* She explained how Mrs. Hayward's reaction was the first of the sort she observed in her eleven years as a homicide detective. *Id.* Later that evening, in front of family members, Mrs. Hayward implicated one of decedent's friends in his death. *Id.* at 121. When Ms. Frederick asked Mrs. Hayward if she would ever consider coming forward and telling that defendant killed Mr. Hayward, she replied, "No, we can't do that because we could get charged with conspiracy." *Id.* at 123. On July 15, 2014, the day after the shooting Mrs. Hayward was taken to the police station for questioning where she denied knowing anyone who owned a gold Dodge Durango. *Id.* at 80. On July 25, 2014, eleven days after decedent's murder, defendant reported his gold Dodge

7

*Commonwealth v. Abdullah Muhammad*

Durango stolen from Elizabeth Township, New Jersey, and the vehicle was never recovered. *Id.* at 49, 56-57.

Dr. Gary Lincoln Collins, Deputy Chief Medical Examiner, testified as the Commonwealth's expert in the field of forensic pathology. *N.T.* 3/20/2014 at 30-31. Dr. Collins performed a post mortem autopsy of the thirty-four-year-old decedent and generated a report with his findings which were introduced at trial. *Id.* at 32. Dr. Collins concluded to a reasonable degree of medical certainty that decedent's manner of death was homicide, caused by three gunshot wounds, one to his left hip, and two, a penetrating and a perforating, gunshot to his left knee. *Id.* at 35, 44. External examination of decedent's body revealed an attempt at life-saving medical interventions. *Id.* at 35. Hospital physicians had placed breathing tubes in decedent's mouth in an attempt to provide air to his lungs, inserted intravenous catheters in his right elbow region to provide fluid in an attempt to get his heart started, and placed electric cardiograph leads and heart monitors on his chest. *Id.* at 35-36.

Observation of the entrance wound located on decedent's left hip, close to his hipbone led Dr. Collins to opine that a bullet entered the left side of decedent's hip and traveled through the soft tissue of his left thigh, passed through the soft tissue around decedent's scrotum, and then went across to his right thigh lodging itself in muscle tissue. *Id.* at 36-37. Decedent subsequently suffered extensive bleeding into the muscles of his left thigh, scrotal sack and the scrotum was enlarged and also filled with blood. *Id.* at 37. Dr. Collins found that the left hip bullet traversed decedent's blood vessels as it traveled through the profunda femoris artery which is a large vessel that supplies blood to the muscles and soft tissues and connects to the aorta. *Id.* at 38. He concluded that the laceration of the profunda femoris artery caused extensive bleeding

8

*Commonwealth v. Abdullah Muhammad*

and prevented oxygen from getting to decedent's major organs causing excessive blood loss, increased blood pressure and hypertension ultimately leading to death. *Id.* at 39.

After examining the gunshot wound to decedent's left knee, Dr. Collins concluded that the first bullet entered the inside of the left knee, went through the soft tissues behind decedent's patella and exited the outer left knee area. *Id.* at 37. The second bullet was through and through, in that there was an entrance and exit wound so the bullet was not recovered. *Id.* Dr. Collins concluded that the lack of soot or huge defects in decedent's clothing indicated that the gun was fired from a distance of beyond 2.5-3 feet and that the injuries were not inflicted at close range. *Id.* at 43. Decedent's toxicology report tested positive for atropine, a resuscitative drug used by hospital physicians to restart the heart. *Id.* at 45.

The Crime Scene Unit (CSU) investigators recovered seven pieces of ballistics evidence from the crime scene and submitted it to the firearms identification unit for analysis. *N.T.* 3/18/2014 at 110. They also recovered six (6) .45 caliber fired cartridge cases from the street and the sidewalk, near the grassy area where decedent was shot, and one copper jacket casing (bullet core) inside the outer wall of the home at 6144 Oxford Street. *Id.* at 112-13. Blood samples from the steps of 6144 Oxford Avenue were also recovered by CSU and submitted to the criminalistics laboratory for DNA and blood analysis. *Id.*

Detective Louis Grandizio testified as the Commonwealth's expert in the field of firearms examination and identified the manufacturer and caliber of the six fired cartridge cases and one bullet specimen received from CSU, as well as the two bullet specimens recovered by the Medical Examiner's Office. *N.T.* 3/19/2014 at 8-10, 22. Detective Grandizio began his testimony by explaining that each bullet that passes through a specific firearm will possess the distinct microscopic markings unique to that one specific firearm left by the tools used during its

9

*Commonwealth v. Abdullah Muhammad*

manufacture. *Id.* at 12-13. Detective Grandizio concluded to a reasonable degree of scientific certainty that the six fired cartridge casings were .45 calibers. *Id.* at 20. After performing a microscopic comparison of the six (6) fired cartridge cases recovered from the crime scene, Detective Grandizio concluded to a reasonable degree of scientific certainty that each was fired from the same .45 caliber automatic firearm. *Id.* at 22-23.

Additionally, Detective Grandizio performed a microscopic comparison of the three bullet specimens, however due to the damage sustained by each, he was unable to conclusively determine if they were fired from the same firearm. *Id.* at 23. Nonetheless, in spite of the condition of the bullet specimens, Detective Grandizio was able to determine that the lands and grooves on all three bullet specimens had the same class characteristics, therefore he did not rule out that they were fired from the same firearm. *Id.* Further analysis of the only undamaged bullet specimen, the one from the Medical Examiner's Office, led Detective Grandizio to conclude that it was a .45 caliber bullet. *Id.* at 24. Detective Grandizio testified to a reasonable degree of scientific certainty that two of the bullets had an indeterminable number of lands and grooves, due to damage, while the third had six (6), but all three had a right hand direction of twist. *Id.* at 24-25. He noted that a Springfield Armory .45 caliber XD has the exact same class characteristic, six (6) land and grooves with a right hand direction of twist, and is therefore consistent with the firearm that produced the undamaged bullet specimen. *Id.* at 26.

Detective James Dunlap testified as the Commonwealth's expert in the field of cellular survey analysis and geographical location. *N.T.* 3/20/2014 at 113. He concluded that on July 14, 2014, at 9:18 a.m., two hours before the murder, defendant placed a cell phone call from the Oxford Circle area within the vicinity of the crime scene. *Id.* at 124. Defendant's cell phone was

10

*Commonwealth v. Abdullah Muhammad*

then turned off for four and a half days and was not turned back on until July 18, 2014 at 9:37 p.m. in Newark, New Jersey. *Id.* at 127; 130-132.

On June 8, 2009, Mrs. Hayward obtained an accidental death and dismemberment policy on her husband, the fifth in a series of insurance policies from Stonebridge Life Insurance Company. *Id.* at 166. On August 26, 2009, Mrs. Hayward filed a claim under the policy which required her to submit documentation and verification that she was not involved in felonious activity or a suspect in the insured's death. *Id.* at 168. To comply, Mrs. Hayward obtained, among other documents, a copy of the police incident report from decedent's murder; however she redacted the section identifying the suspect vehicle as a gold Dodge Durango. *N.T.* 3/20/2014 at 75. After receiving the $100,000.00 insurance payment on October 27, 2009[4], Mrs. Hayward moved to Virginia *N.T.* 3/19/14 at 150.

At trial the parties stipulated that on December 9, 2009, defendant, while incarcerated in an unrelated matter placed a phone call from prison to Mrs. Hayward which evidenced the continued relationship between the two. *N.T.* 3/20/2014 at 64.

### III. STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In accordance with PA. R.APP. PROC. 1925 (b), defendant raised the following issues in his Statement of Matters Complained of on Appeal.[5]

1. Did the lower court err in denying defendant's requests for a continuance so that counsel of his choice could enter an appearance and try the case?

2. Did the lower court err in admitting the acts of co-defendant, Tania Boozer, including the procurement of an insurance policy for the decedent; contacting the insurance company to inquire if, "getting shot was an accident" under the policy; the doctoring of police records; and moving to Virginia when the Commonwealth failed to introduce evidence demonstrating that said acts were objects of the conspiracy between defendant and Boozer?

---

[4] The payment was cashed three days later at the Bank of America on 10/30/2014. *N.T.* 3/20/2014 at 174.
[5] The statement below was taken verbatim from defendants filed Statement of Errors.

11

*Commonwealth v. Abdullah Muhammad*

3. Did the lower court err in admitting evidence of a phone call which showed that defendant was incarcerated on the other charges prior to being to being [sic] arrested in this matter?

4. Did the lower court err in denying defendant's request for a mistrial after the prosecutor's remarks in closing argument improperly shifted the burden of proof to the defendant?

## IV. DISCUSSION

### A. The Denial of Defendant's Requested Continuance

Defendant first claims that this court "err[ed] in denying [his] requests for a continuance so that counsel of his choice could enter an appearance and try the case?" Statement of Errors ¶ 1.

Indeed, "[a] defendant has a Constitutional right to choose at his own cost and expense any lawyer he may desire." *Commonwealth v. Novak*, 395 Pa. 199, 213 (1959) (referencing Constitution of Pennsylvania, Art. I, § 9, P.S. Constitution of the United States, Amend. V (due process), Amend. XIV, (due process)). However, it is undeniable that "the grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion." *Commonwealth v. Randolph*, 582 Pa. 576, 583 (2005). "Discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record. . ." *Id.* Therefore, "[a] trial court exceeds its constitutional authority only when it exercises its discretion to deny a continuance on the basis of "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Commonwealth v. Sandusky*, 77 A.3d 663, 671-72 (Pa. Super. 2013). "To determine whether a constitutional violation occurred, [the appellate court] must examine the circumstances present in the case, especially the reasons presented to the trial court for requesting the continuance." *Id.* at 672.

In *Commonwealth v. Randolph*, the trial court denied defendant's request for a

12

continuance when he "sought private counsel's representation because there was a major breakdown in communication between him and court-appointed counsel and because court-appointed counsel was unprepared, rather than for purposes of delay." 582 Pa. 576, 583 (2005). On appeal, Randolph alleged that "the trial court erred in denying him the right to have private counsel represent him during trial and in denying a continuance to enable private counsel to represent him." *Id.* at 583. There, on May 1, 2003, two business days before the trial was scheduled to commence, and after the case had already been continued twice, defendant informed the court of his intention to retain private counsel, even though he first contacted private counsel January, 2003, four months earlier. *Id.* at 586. The trial court denied Randolph's request for a continuance, but permitted private counsel to participate and was willing to offer him time to prepare for the trial, however private counsel never showed up at trial. *Id.* The Supreme Court found "no abuse of discretion in the trial court's refusal to grant appellant's request for a continuance" where "trial court weighed appellant's right to counsel of his choice against the state's interest in the efficient administration of justice in considering the motion for continuance." *Id.* See also *Commonwealth v. Brooks*, 2014 WL 6491611, at *1 (Pa. Nov. 20, 2014) (finding that the trial court did not abuse its discretion in determining that defendant's day-of-trial request for a continuance, so that he could represent himself, should be denied, and the Superior Court erred in concluding otherwise).

Similarly, this court did not arbitrarily deny defendant's motion for a continuance and request to retain private counsel. Here, defendant's trial and current counsel was appointed and entered his appearance on January 22, 2013 before Judge Benjamin Lerner. Docket, *Commonwealth v. Muhammad*, CP-51-CR-0005853-2012, at *19 (Phila. Ct. C.P. January 22,

13

*Commonwealth v. Abdullah Muhammad*

2013). After that date, the case was continued four times, three of which were defense requests.[6] *Id.* at 20, 23, 24 and 26. On February 14, 2013, Judge Learner assigned a trial date of March 17, 2014 before this court. However, aware of his pending trial date for nearly a year, defendant waited until January 31, 2014 to apprise this court of his desire to remove appointed counsel[7] and retain private counsel.[8] After finding that (1) defendant did not have an irreconcilable conflict with appointed counsel and (2) new counsel would not make himself available on the date set for trial, this court denied defendant's motion for a continuance. However, as in *Randolph*, this court gave private counsel the opportunity to prepare for and participate in the trial, and ruled that private counsel could enter his appearance on the February 14, 2014 status date, if he would be prepared to try the case on March 17, 2014. *Id.* However, private counsel did not show up for trial or attempt to enter his appearance, despite the fact he did not have a trial scheduled the week of March 17, 2014.[9]

In considering defendant's motion for a continuance, this court weighed appellant's right to counsel of his choice against the judiciary's interest in the efficient administration of justice. Therefore, because this court did not simply arbitrarily deny defendant's request, there was no abuse of discretion.

### B. The Admission of Co-defendant's/ Co-conspirator's Acts

Defendant's second claim is that this court erred in "admitting the acts of co-defendant, Tania Boozer Hayward, including the procurement of an insurance policy for the decedent,

---

[6] Trial was continued on 2/14/2013 (on which date it was set for trial before this court the weeks of March 17 and 24, 2014), 6/27/2013, 7/23/ 2013, and 10/31/2013. Docket, *Commonwealth v. Muhammad*, CP-51-CR-0005853-2012, at *20, *23, *24 and *26 (Phila. Ct. C.P. February 14, 2013).

7 Defendant sought to remove counsel because he apparently (1) did not visit defendant in prison as often as he would have liked, (2) allegedly maintained sporadic communication and (3) failed to file a meritless motion. *N.T.* 1/31/2104 at 7-11.

[8] Docket, *Commonwealth v. Muhammad*, CP-51-CR-0005853-2012, at *27 (Phila. Ct. C.P. January 31, 2012).

[9] The attorney indicated that he would not be available for trial until May 1, 2014 due to "litigation and personal commitments," although he was physically available the week of March 17, 2014, he stated that he would not take the case because he had a trial scheduled the following week, March 24, 2014. *N.T.* 1/31/2014 at 18, 27.

14

*Commonwealth v. Abdullah Muhammad*

contacting the insurance company to inquire if, "getting shot was an accident" under the policy, doctoring of police records, and moving to Virginia." Statement of Errors ¶ 2. Defendant further contends that "the Commonwealth failed to introduce evidence demonstrating that said acts were objects of the conspiracy between defendant and Boozer?" *Id.*

On a challenge to a trial court's evidentiary ruling, [the Superior Court's] standard of review is one of deference." *Commonwealth v. Herb*, 852 A.2d 356, 363 (Pa. Super. 2004). "The admission or exclusion of evidence . . . is within the sound discretion of the trial court." *Hawkey v. Peirsel*, 869 A.2d 983, 989 (Pa. Super. 2005). "Thus the Superior Court's standard of review is very narrow; reversal may only occur upon a showing that the trial court clearly abused its discretion or committed an error of law." *Id.* "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable . . . as shown by the evidence of record. *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa. Super. 2001)."

In Pennsylvania, under the co-conspirator exception to the hearsay rule, the statements of co-conspirators are admissible if "[t]he statement is offered against an opposing party and. . .was made by the party's co-conspirator during and in furtherance of the conspiracy." PA. R.EVID. 803. "To lay a foundation for the co-conspirator exception to the hearsay rule, the Commonwealth must prove that: (1) a conspiracy existed between declarant and the person against whom the evidence is offered and (2) the statement sought to be admitted was made during the course of the conspiracy." *Commonwealth v. Feliciano*, 67 A.3d 19, 27 (Pa. Super.) *appeal denied*, 81 A.3d 75 (Pa. 2013) (quoting *Commonwealth v. Basile*, 458 A.2d 587 (Pa. Super. 1983)). "In addition, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed." *Id.* In other words, "[t]he order of proof is within the

15

*Commonwealth v. Abdullah Muhammad*

discretion of the [trial] court, which may, upon only *slight evidence* of the conspiracy, admit such statements subject to later proof of the conspiracy." *Id.* (quoting *Commonwealth v. Plusquellic*, 449 A.2d 47 (Pa. Super. 1982)) (emphasis added).

In *Commonwealth v. Feliciano*, the trial court admitted the following statement of co-conspirator made to an undercover police officer, "He's bagging it up. He will be out[,]" and convicted defendant of PWID and conspiracy. *Feliciano*, 67 A.3d at 27. On appeal, Feliciano argued because the Commonwealth failed to establish a conspiracy, the statements of an alleged co-conspirator were inadmissible. *Id.* at 26. The Superior court however found that the statements were admissible pursuant to the co-conspirator exception to the hearsay rule. *Id.* The court reasoned that because "only slight evidence of the conspiracy is needed for a co-conspirator's statement to be introduced and the order of proof is discretionary[,] [a] co-conspirator's statement is only inadmissible where it is the sole evidence of the conspiracy." *Id..* Therefore, because the co-conspirator's statement, although essential to establishing defendant's guilt beyond a reasonable doubt, was not the only evidence of the existence of the conspiracy, it was admissible. *Id.*

Similarly here, as noted in the facts presented above, it is clear that the Commonwealth presented sufficient evidence for the jury to reasonably conclude that (1) a conspiracy existed between Mrs. Hayward and defendant and (2) that the acts of Mrs. Hayward, "including the procurement of an insurance policy for the decedent; contacting the insurance company to inquire if, "getting shot was an accident" under the policy; the doctoring of police records; and moving to Virginia" were all made during the course of the conspiracy. It is clear that, even more than Mrs. Hayward's acts, the jury accorded great weight to the testimony of her sister, Ms. Frederick, in determining that Mrs. Hayward and defendant conspired to murder her husband.

16

*Commonwealth v. Abdullah Muhammad*

Because only slight evidence of a conspiracy is required to admit the statements of a co-conspirator, this court did not abuse its discretion in admitting Mrs. Hayward's acts, in light of the other overwhelming evidence which proved that a conspiracy existed.

### C. Admission of Phone Call Evidencing Prior Bad Acts

Next, defendant claims that "the lower court err[ed] in admitting evidence of a phone call which showed that defendant was incarcerated on the other charges prior to being arrested in this matter?" Statement of Errors ¶ 3.

As stated above, the Superior Court's standard of review for a claim that the trial court erred in issuing an evidentiary ruling is "one of deference." *Herb*, 852 A.2d at 363. Because evidentiary rulings are within the sound discretion of the trial court, the appellate standard of review is so narrow that the trial court's evidentiary ruling may only be reversed if defendant proves that there was a clear abuse of discretion or an error of law. *Hawkey*, 869 A.2d at 989. To prevail on appeal, the record must show that the trial court exercised judgment that was beyond a mere error in judgment and either manifestly unreasonable, or the overriding or misapplication of the law. *Cameron*, 780 A.2d at 692.

Specifically addressing the admission or exclusion of character evidence, Pennsylvania Rule of Evidence 404(b) states in pertinent part:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Here, after giving a curative instruction, this court admitted evidence of defendant's prior arrest in an unrelated matter for the sole purpose of showing the relationship between defendant

17

*Commonwealth v. Abdullah Muhammad*

and Mrs. Hayward and explaining the natural development of the facts. *N.T.* 3/20/2014 at 62-64. The phone call between defendant and Mrs. Hayward, after decedent's death, not only provided evidence of a continuing conspiracy, but it also corroborated Ms. Frederick's testimony while evidencing a motive for the killing. After balancing the Commonwealth's need for the phone call and its probative value against the prejudicial impact on the jury, this court admitted the evidence with a curative instruction. *N.T.* 3/18/2014 at 21-22. Thus, this court properly determined that the probative value of the phone call outweighed any potential for unfair prejudice.

### D. Defendant's Request for a Mistrial

Defendant's final claim is that "the lower court err[ed] in denying his request for a mistrial after the prosecutor's remarks in closing argument improperly shifted the burden of proof to the defendant?" Statement of Errors ¶ 4.

Under Pennsylvania law, "[w]hen an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial. . . [o]therwise, the trial judge may declare a mistrial only for reasons of manifest necessity." PA. R. CRIM. PRO. 605.

> The decision whether a mistrial should be granted as a result of allegedly improper prosecutorial comments during closing argument is within the discretion of the trial court. But even where the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. The language must be such that its "unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." The effect of such remarks depends upon the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court. Moreover, the complained of remarks must be viewed, in part, within the context of the conduct of defense counsel.

*Commonwealth v. D'Ambro*, 500 Pa. 303, 310 (1983) (internal citations omitted). Here, there was no unavoidable effect of the prosecutor's statement that would prejudice the jury to develop a fixed bias and hostility toward the defendant. In response to defendant's question, "Where is the

18

*Commonwealth v. Abdullah Muhammad*

proof[,]" asked while testifying, the prosecutor discussed the use of corroboration as a method of obtaining the truth, and asked defendant "Where is his proof." *N.T.* 3/24/2014 at 69.[10] The Commonwealth's attorney, however, premised the aforementioned query with the statement, "[defendant] doesn't have to present evidence . . ." Defendant nonetheless argues that the Commonwealth's statement somehow shifted the burden of proof to the defendant causing irreparable prejudice and warranting a mistrial. In light of this court's instructions, defendant's claim is meritless. Although this court agreed with the Commonwealth that the comment made during closing argument did not rise to the level of a mistrial, at defendant's request, a curative instruction was given. *N.T.* 3/24/2014 at 77-79. In fact, over the prosecutor's objection, this court at the request of defendant, specifically referenced the prosecutor's comment made during closing argument in its curative instruction and reminded the jury that the burden of proof is on the Commonwealth, not defendant.[11]

---

[10] The prosecutor's statement in context is as follows:

> **MR. NOTARISTEFANO:** Bottom line is he thinks he knows the law better than anybody else. He doesn't have to present evidence, but when you think about it, judge it by the same standard you judge my evidence.
> He gets up on this witness stand after seeing all the evidence, how it was corroborated and he has the audacity to say, "Where is the proof?" Where is his proof?

*N.T.* 3/24/2014 at 69. *See generally Commonwealth v. Trivigono,* 750 A.2d 243 (2000) (holding that "[a] remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of [an opposing party]").

[11] The relevant portion of the curative instruction is as follows:

> **THE COURT:** In the course of his argument the prosecutor did, I believe, on one occasion make the comment in response to the defendant in this case, something to the effect of: Where is your proof?
> I remind you, ladies and gentleman, that the person accused of a crime is not required to prove anything in his own defense. The burden of proof is on the Commonwealth. I shall say more about how evidence is to be evaluated when I charge you in the law, but at this juncture we'll take a short recess.

*N.T.* 3/24/2014 at 78-79.

19

*Commonwealth v. Abdullah Muhammad*

In light of the "fair response" standard, the appropriateness of Commonwealth's closing argument as a whole, and the curative instruction given by this court, the jury properly weighed the evidence and rendered a verdict in accordance therewith. Therefore, this court did not abuse its discretion in refusing defendant's request for a mistrial.

## V. CONCLUSION

For the aforementioned reasons, this court's judgment of sentence should be AFFIRMED.

BY THE COURT

December 23, 2014

_____

SANDY L.V. BYRD, J.

20

*Commonwealth v. Abdullah Muhammad*